## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **No. 1:21-CR-00190-DLF** |
| | : | |
| | : | |
| **ZACHARY JORDAN ALAM,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SET BOND AND CONDITIONS OF RELEASE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to the "Motion to Set Bond and Conditions of Release" filed by the defendant, Zachary Jordan Alam. The defendant appears to seek revocation of detention pursuant to 18 U.S.C. § 3145(b).

The defendant should continue to be detained pursuant to 18 U.S.C. §§ 3142(f)(1)(A) (Presumption Offense under 18 U.S.C. § 2332b(g)(5)(B), or Crime of Violence) and 3142(f)(2)(A) (Serious Risk of Flight). On March 5, 2021, the defendant was indicted by a federal grand jury on 11 counts, including eight felony charges, of which two carry maximum 20-year sentences. The defendant poses a pronounced risk of flight and was, until his out-of-state arrest at a motel on January 30, 2021, believed to be willfully evading law enforcement. He was, moreover, a manifestly violent and vocal aggressor in the events inside the U.S. Capitol building on January 6, 2021 – including, in particular, in the destructive scene by the Speaker's Lobby doors, where a woman was fatally shot climbing through a glass panel that the defendant had punched out with a

1

helmet moments before.

The government is prepared to proceed to argument at the motions hearing scheduled for June 24, 2021.   Under the Bail Reform Act, the Government may proceed by way of proffer. *See*, *e.g.*, *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 42 (D.D.C. 2013).   Pursuant to the facts, circumstances, and authorities presented herein and at the hearing, the defendant should continue to be detained.

## BACKGROUND

### Factual Background

The defendant was among the scores of individuals who entered the U.S. Capitol, without authority to be there, at First Street, SE, Washington, D.C. on January 6, 2021, when a joint session of the United States Congress had convened to certify the vote count of the Electoral College of the 2020 Presidential Election.

Video footage obtained from U.S. Capitol Police showed that, at approximately 14:17:53, Alam, wearing a dark colored jacket, a black and tan fur-lined hat, and a black shirt with a yellow and red label on the front, climbed through the window of the Senate Wing Door entrance to the Capitol.

Open-source videos, moreover, showed Alam among a large, aggressive crowd trying to breach a barricaded door to the Speaker's Lobby, a hallway that connects to the House of Representatives chambers.   Members of the crowd were shouting and gesticulating at the officers.   The words "Speaker's Lobby" were visible at the top of the doors.   Chairs, visible through the door's glass panels, were used to barricade the door from the inside of the Speaker's Lobby.   The door was guarded by three Capitol Police officers in front.   Alam repeatedly

punched the glass panels of the doors immediately behind the officers, causing the glass to splinter.   While throwing two of the punches, Alam pushed his body up against one of the Capitol Police officers guarding the door.

Additional officers in riot gear arrived behind the crowd at the Speaker's Lobby doors, and the three officers guarding the door appeared to move to the adjacent wall.   Seconds after the officers stepped away from the doorway, Alam began kicking the glass panels of the Speaker's Lobby door.   Shortly thereafter, he accepted a black-colored helmet from an individual with a yellow "Don't tread on me" flag, took off his fur-lined hat and red baseball hat, and violently struck the middle glass panel repeatedly with the helmet, further shattering the window.   Alam then smashed the window panel on the right with the helmet.   Chants could be heard of "Break it down!" and "Let's fucking go!"   Babbitt was shot while attempting to climb through one of the shattered windows.

Alam was identified after W-1, Alam's family member, submitted two tips in response to FBI calls for the public's assistance in identifying him and was interviewed.   FBI agents also retrieved a driver's license photo and Facebook profile of Alam and determined that the photos matched the individual depicted on the video footage.   On January 24, 2021, W-1 was interviewed by FBI agents and confirmed that the male hitting the glass by the Speaker's Lobby doors with the helmet, as well as depicted in photographs from the video footage and the FBI BOLO (Be on the Lookout), was Alam, W-1's relative.   W-1 looked at a photograph depicting a partial "2020" tattoo and advised agents that Alam has such a tattoo and that it states in full, "$250k in 2020."   W-1 recognized the black Pirelli shirt bearing the red and yellow logo as Alam's.   W-1 also advised that on January 18, 2021, after the events at the Capitol, Alam called

W-1 from a different phone that is not the number he has used for years and that Alam declined to provide his exact location other than saying he "was in the DC/Virginia area."   W-1 further advised that the defendant had, since the events at the Capitol, asked multiple relatives outside the Washington, D.C. area, including W-2, another relative, if he could stay at their residences and indicated that the FBI was looking for him.   According to W-1, the defendant said he was sorry for what he had done at the U.S. Capitol but he was not going to turn himself into authorities because he did not want to go to jail again.   Agents also interviewed W-2, who confirmed that the defendant had, sometime after January 6, 2021, showed up at W-2's residence unexpectedly, seeking a place to stay and stating that he did not want to go back to jail.

## **Procedural Background**

On January 25, 2021, the Honorable Zia M. Faruqui issued an Arrest Warrant pursuant to a Complaint charging the defendant with violations of 18 U.S.C. §§ 111(a) and (b) (Assault on a Federal Officer with a Dangerous Weapon); § 1361 (Destruction of Government Property over $1,000); § 1512(c)(2) (Obstruction of an Official Proceeding), 18 U.S.C. § 1752(a) and (b) (Unlawful Entry on Restricted Building with a Dangerous Weapon); and 40 U.S.C. § 5104(e)(2)(D), (F), and (G) (Violent Entry and Disorderly Conduct).

On January 29, 2021, the Honorable G. Michael Harvey issued a warrant for the search of GPS information and cell-site location data for the defendant's phone.

On January 30, 2021, the defendant was located and ultimately arrested by agents of the FBI Philadelphia Division at a motel in Denver, Pennsylvania.

On February 2, 2021, the defendant appeared in the Eastern District of Pennsylvania for what was described by the "Bail Status and Order" as a "REMOVAL/IA/AC/IDENTITY

HEARING/DETENTION HEARING," where the magistrate judge asked the AUSA to "address identity, probable cause and detention."   The defendant contested all three.   The magistrate judge found that both identity and probable cause had been established, and then ordered the defendant detained after finding him to be both a danger to the community and a flight risk.

On March 5, 2021, a federal grand jury of the District of Columbia returned an 11-count indictment against the defendant.   The indictment charges him with two counts of assaulting, resisting, or impeding officers, one while using a dangerous weapon, in violation of 18 U.S.C §§ 111(a)(1) and (b), and one with the intent to commit another f]elony, in violation of 18 U.S.C. § 111(a)(1); one count of obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; one count of interfering with a federal officer during the commission of a civil disorder, in violation of 18 U.S.C. §§ 231(a)(3) and 2; one count of destruction of government property, in violation of 18 U.S.C. § 1361; three counts of unlawful entry, disorderly conduct, or violent conduct using a dangerous weapon in restricted buildings or grounds, in violation of 18 U.S.C. §§ 1752(a)(1), 1752(a)(2), 1752(a)(4) and (b)(1)(A); and three counts of disorderly conduct, violent conduct, or parading or demonstrating in a Capitol building, in violation of 40 U.S.C. §§ 5104(e)(2)(D), 5104(e)(2)(F), and 5104(e)(2)(G).   Two of the counts – assaulting, resisting, or impeding officers while using a dangerous weapon, and obstruction of an official proceeding – carry maximum penalties of 20 years.

## ARGUMENT

### Applicable Statutory Authority

There are several statutory bases for detention in this case.   First, this Court may detain a defendant upon motion of the government in a case that involves "a crime of violence … or an

offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed."   18 U.S.C. § 3142(f)(1)(A).   Here, the defendant's charged crimes include a felony count for destruction of government property exceeding $1,000, in violation of 18 U.S.C. § 1361 – an offense that is specifically enumerated in 18 U.S.C. § 2332b(g)(5)(B). This case thus triggers the presumption of detention set forth in 18 U.S.C. § 3142(e)(3).   As that provision notes, "Subject to rebuttal by the person, *it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community* if the judicial officer finds that there is probable cause to believe that the person committed—… an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed."   18 U.S.C. § 3142(e)(3)(C).   In other words, should this Court find probable cause to believe that the defendant committed a violation of § 1361, which carries a 10-year maximum sentence, there is a rebuttable presumption that the standard for detention is satisfied.

As the D.C. Circuit has explained, "the presumption operate[s] at a *minimum* to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption."   *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985).   But even if the burden of production is met, the presumption "does not disappear entirely," but rather "remains a factor to be considered among those weighed by the district court."   *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).   The government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight – even where it is presumed that those standards are satisfied.   Relevant to that ultimate

6

determination are the usual factors under 18 U.S.C. § 3142(g) – namely, (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including the person's past conduct and criminal history; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Second, the Court may detain a defendant upon motion of the government or the Court's own motion in a case that involves a "serious risk" that the defendant "will flee." 18 U.S.C. § 3142(f)(2)(A). Where "risk of flight" is the basis for detention, the presumption of detention does not apply, but the government must only prove that no conditions will reasonably assure the defendant's appearance or community safety by a preponderance of the evidence standard – not clear and convincing evidence. *See United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996).

Third – although this Court need not reach this given the two aforementioned bases – the threshold of 18 U.S.C. § 3142(f)(1)(A) would alternatively be satisfied here through a "crime of violence." *See United States v. Rachel Marie Powell*, No. 21-cr-197 (C.J. Howell, Feb. 11, 2021) (applying rebuttable presumption in Capitol riots case without resolving whether offense was crime of violence); *United States v. Christopher Grider*, No. 21-cr-22 (J. K.B. Jackson, Feb. 22, 2021) (same). The defendant's charged offenses for assaulting, resisting, or impeding any law enforcement officer using a dangerous weapon as well as for destruction of government property readily meet the definition in 18 U.S.C. § 3156(a)(4) – namely, "an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another." *See, e.g., Gray v. United States*, 980 F.3d 264, 265 (2d Cir. 2020) ("We join six other courts of appeals in holding" that "assaulting a federal officer under 18 U.S.C. § 111(b) is

categorically a 'crime of violence.'"); *United States v. Abu Khatallah*, 316 F. Supp.3d 207, 213-15 (D.D.C. 2018) ("Injuring federal property categorically requires a use of force against the property of another"; 18 U.S.C. § 1363 thus constitutes a "crime of violence" for purposes of 18 U.S.C. § 924(c)).   The existence of an indicted "crime of violence" likewise justifies a detention hearing and the ordinary evaluation of the § 3142(g) factors.   And this Court would therefore need to find, by clear and convincing evidence, that no conditions will reasonably assure the defendant's appearance or safety of the community.

## Analysis

### 1.   The Defendant Poses a Serious Flight Risk

The defendant presents a pronounced risk of flight.   There is strong evidence that, until his arrest, the defendant was willfully evading law enforcement and apprehension in this matter. Although the defendant lives in the District of Columbia, he was ultimately located by law enforcement authorities, pursuant to lawfully obtained GPS information and cell-site data, in Denver, Pennsylvania, at a motel where he had a reserved room.   The defendant was arrested on January 30, 2021, five days after the complaint against him was issued.

As noted, the defendant was initially identified by a family member, W-1, who advised the FBI that on January 18, 2021, the defendant called W-1 from a different phone number from the one the defendant has used for several years, that the defendant declined to provide his location, and that that the defendant had, since the events at the Capitol, asked multiple out-of-state relatives, including W-2, if he could stay with them and indicated that the FBI was looking for him. According to W-1, the defendant was not going to turn himself in because he did not want to go to jail again.   W-2 likewise confirmed that the defendant had, sometime after January 6, 2021,

8

showed up at W-2's residence unexpectedly, seeking a place to stay and stating that he did not want to go back to jail.   Thus, there is strong evidence that the defendant knew he was a target of investigation and *did* in fact flee out of state in efforts to avoid the reach and detection of law enforcement.

The investigation, moreover, has revealed that the defendant had since September 2018, maintained a month-to-month lease of a storage unit in Washington, D.C., which he appears to have referred to in the notebook described above.   Lawfully obtained records indicate that, after making monthly payments for the unit for well over two years, the defendant abruptly emailed the manager on January 28, 2021 – two days before his arrest – that he knew it was "late notice" but that he had cleared out the unit of his belongings and left the keys.   The defendant's sudden vacating of his long-term unit further confirms that the defendant, at the time of his arrest in Pennsylvania, was on the run and evading law enforcement.

Moreover, the defendant is known to have used aliases.   Lawfully obtained records show that the defendant has provided multiple false names to service providers, including at least one false name – "Zachary Studabaker" – for services since the events of January 6, 2021.

In addition, according to the government's information, the defendant was at the time of his arrest driving a vehicle that he had purchased around September 2020 but never registered, and for which the defendant had used multiple license plates, including in recent months.   These include a Washington, D.C. license plate, found inside the defendant's vehicle in Pennsylvania, which was reported stolen in 2018 by an individual who indicated that the front license plate was taken off his vehicle while parked in Northwest D.C.   D.C. traffic cameras captured a black Chevy truck matching the description of the defendant's vehicle bearing this license plate as

recently as January 4, 2021.    Moreover, when agents located the defendant at the motel in Pennsylvania, they observed the defendant's black Chevy truck parked outside and noted that it bore Pennsylvania license plates for a Mazda vehicle.

Upon arrest, moreover, the defendant had multiple identification cards in his wallet, including a D.C. driver's license and a D.C. identification card for one male, a Permanent Resident card for a second male, and University student identification card for a female.    Among the items agents seized from the defendant's motel room nightstand, moreover, were two mobile phones – a Verizon flip phone as well as an iPhone.    Agents also seized, from on top of a bag, a copy of the magazine "Recoil OffGrid" – a magazine which, according to public source information, has an audience of people interested in living "off the grid" and provides "practical" information about "key topics you need to be resilient in the face of hardship," including "escape and evasion."    *See* https://www.offgridweb.com.    The defendant also had with him the fur-lined hat, Nike "Pirelli" t-shirt, and grey backpack that he wore on January 6, 2021 inside the Capitol Building.

Agents also seized, from on top of the bag, a notebook.    The defendant had handwritten on the notebook's pages what appear to be to-do lists organized by date.    For "Sun 1/10/21," the defendant had written "activate burner," indicating that four days after the events at the U.S. Capitol, he began using a "burner" phone.    That "burner" appears to refer to the Verizon flip phone that agents recovered, as executing agents photographed a receipt dated January 10, 2021, for a "Verizon" phone paid for with $65.13 in cash at a Walmart in Pennsylvania.    The defendant's other notes from January 10 referred to his intent to "buy crypto[currency]" and "consolidate crypto," "turn off phone, put in plastic bag," and get "ID's" and "clothes" from "storage."



Meanwhile, on "Wed 1/13," the notes indicate that the defendant planned to "buy CRV on Binance," an online exchange for trading cryptocurrencies.   On "Mon 1/18/21," he planned to "open new bank acct" and "Delete Pics on FB."   On another date, he wrote, "re-allocate funds to decentralized assets," "Trade truck for car," and "VPN on Mac," next to notes that appear to concern his actions on January 6 ("Video / Certify your American-ness. / Why I did what I did. Explanation / Call out Trump.").   He also wrote on another page, "Research security (location intelligence)" and "Research how to launder BTC [bitcoin]" right above notes that likewise appear to concern January 6: "Wanted a civilized discussion w/ our representatives but the door wouldn't open" and "Call out Pence – should have been over."   The notes are additional indicia that the defendant knew he was a target of investigation and was actively engaged in efforts to cover his tracks in various respects.

        Indeed, in a jail call he made on February 21, 2021, the defendant told an individual that he believed he had been tracked down by law enforcement through GPS on his phone and

complained that he had downloaded "VPN on my phone" and "got IP Vanish" but that it was "a bullshit service"; "I tried to make that thing run all the time, and it just shut off like randomly sometimes… They can't f--ing have the VPN running 24 hours?   Basically the same thing as not having it… That's how they figured out my general location."

Beyond that, the defendant does not appear to have strong or stable ties to the community that might mitigate against the risk of flight.   Although the defendant's motion states that the defendant "was gainfully employed and lived on his own" prior to his incarceration, D.E. 18 at 5, the government's investigation to date has indicated that the defendant had no fixed address.   The defendant did not reside at the Virginia address listed on his driver's license, which the defendant also provided as his address to two services providers in January 2021.   W-1, the family member, reported that W-1 knew nothing about the defendant's friends and that he had refused to tell W-1 where he lived.   W-1 stated that in 2015, the defendant lived for a period of time in a homeless shelter in Washington, D.C.   W-1 also noted that the defendant has held several odd jobs but nothing steady.   W-2 also told agents that the defendant would never provide W-2 with his address.   W-3, an individual who has employed the defendant on and off in various jobs, told agents that W-3 believed the defendant lived in "various locations," staying part time with his mother, at a homeless shelter at times, and in a storage unit he rented.

The government's investigation has also not revealed any steady employment by the defendant prior to his incarceration.   W-3 told agents that he had given the defendant "side work" doing construction in the "summer or fall of 2020"; W-3 also stated that he wanted to help the defendant "get on his feet" so he helped get him a job as a hotel concierge but that the defendant "did not show up for work and was eventually let go."   In a jail call the defendant made on March

15, 2021, the defendant – in explaining why he acted the way he did on January 6 – explained his anger surrounding the "coronavirus," stating among other things that "my job was based off tourism…. I got laid off from my job, right?   Like I didn't have a job anymore, 'cause I worked at that hotel … I was a concierge."

Finally, the defendant has a history of failures to appear in the court system.   In Maryland, failures to appear were issued against him in January 2017 and twice in March 2017.   In Virginia, a failure to appear on a felony offense was issued against him in February 2017.   In New York, a failure to appear was issued against the defendant in December 2017.   In the District of Columbia, a fugitive from justice felony charge was issued against him in January 2018.   The defendant's dismal track record in multiple jurisdictions of appearing at court dates only reinforces his risk of non-appearance in this matter.

Given all the above facts, the defendant presents a serious and significant flight risk.   That risk was in fact realized in the days leading up to his arrest.   The defendant appears to have had not only the avowed will, but also the means or tools, to avoid detection and evade law enforcement and to have begun putting plans into action.   Indeed, the evidence relating to the defendant's aliases and vehicle indicates that the defendant has a history that predates January 6, 2021 of using such tools to skirt identification.   Nor is there any indication that the defendant – who now faces an 11-count indictment, including 8 felony counts, two of which carry 20-year maximum sentences, *see infra* – has a strong network or grounding in the community that will ensure or incentivize his compliance with conditions of release.   As such, a preponderance of evidence establishes that no conditions or combination of conditions will reasonably mitigate the pronounced likelihood that the defendant will flee or attempt to flee.

2.   **The Defendant Poses a Serious Danger to Others**

Separately, the defendant poses a significant danger to the community.   The applicable presumption of detention, which is triggered by the defendant's charged violation for a felony count of destruction of government property – befits the extremely serious nature and circumstances of the defendant's actions on January 6, 2021, and that presumption should firmly hold.

Although the defendant is charged with causing damage to the glass-paned doors of the Speaker's Lobby in the U.S. Capitol, his alleged conduct goes well beyond an offense against property.   Among the charges the defendant faces are those for assaulting, resisting, or impeding a federal officer with a dangerous weapon, which is punishable by up to 20 years' imprisonment; and for obstructing an official proceeding as he unlawfully entered the Capitol Building as Congress convened in a Joint Session to affirm the Electoral College vote in the 2020 Presidential Election, an offense which also carries a 20-year maximum.   These are significant felony charges carrying hefty penalties, and they reflect the grave facts and circumstances of the defendant's conduct on January 6, 2021.   The defendant was at the forefront of the raucous mob that yelled obscenities at the police officers and forcibly descended on and sought to breach the doorway to the Speaker's Lobby, approximately 20 feet away from the House Chamber.   The words "Speaker's Lobby" were visible at the top; chairs were visible through the door's glass panels as officials sought to shore up the doorway from the inside; and the door was guarded by three uniformed officers in front.   Undeterred, the defendant repeatedly punched out the glass with his bare fist, including inches from the officers' faces.   Later armed with a helmet – given to him by a nearby male wearing a yellow "Don't Tread on Me" flag – he proceeded to repeatedly shatter

numerous windows with still more force, including the very window through which the woman, later identified as Ashli Babbitt, tried to climb when she was fatally shot.   The defendant, meanwhile, is captured on video personally yelling and gesticulating at the officers, yelling to the crowd, and kicking the doors as soon as the three officers appeared to move to the adjacent wall. His unhinged, violent actions at the front of that volatile mob, over the course of several minutes, amply demonstrate the dangerousness he poses to others.[1]





---

[1]  The Washington Post published the relevant events from open-source video footage here:
https://www.washingtonpost.com/investigations/2021/01/08/ashli-babbitt-shooting-video-capitol/

















Nor was the defendant's belligerent conduct that day limited to the Speaker's Lobby doorway.   Rather, the video footage shows the defendant was involved in at least two other singularly aggressive interactions with law enforcement officers inside the Capitol Building.

17

First, the defendant stood out among the mob of violators who stood at an impasse with a line of law enforcement officers blocking a hallway to the main entrance to the House Chamber.   At a point when nearly all the members of the crowd still remained in front of the group of officers, the defendant could be seen walking around behind them and weaving through them, yelling "HEY!!!!" loudly and repeatedly while gesticulating his arms.   One officer repeatedly tries to get the defendant closer to the crowd and can be heard saying "get back over there."   At one point the defendant, appearing agitated, screams toward the officers something along the lines of, "Epstein bro!   Motherf---er Epstein!" before others in the crowd appear to try to contain him.[2]





---





Shortly thereafter, the massive crowd overpowers the group of officers, pushing past them, opening the door to the hallway, and ultimately mobbing the entrance to the House Chamber.

Later, the defendant was seen walking down the hallway from the House Chamber toward the East stairs toward the Speaker's Lobby.    With an agitated demeanor, he walked toward a male U.S. Capitol Police security official wearing a suit and an unknown female, and immediately got close to the male official's face:







In short, the video footage indicates that there were multiple instances in which the defendant stood out among the angry crowds for his particular disruptiveness – needing, at one point, to be restrained by other rioters – and in which he appeared to be taunting, resisting, or otherwise intimidating officers who were merely performing their official functions and seeking to maintain order.

In any event, the manifestly threatening and violent conduct for which the defendant has been indicted weighs heavily in favor of detention and is substantiated by strong video evidence, including numerous open-source videos.   It also squarely puts the defendant in the "different category of dangerousness" – "those who actually assaulted police officers and broke through windows [or] doors" – that the D.C. Circuit described in *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021) and specifically differentiated from the defendants at issue in that case.

But to be clear, the case for the defendant's dangerousness is not limited to the nature and circumstances of the charged offenses.   The defendant's jail calls since his arrest compound the concerns of the defendant's dangerousness, suggesting that he poses a potential threat to witnesses. On his calls, the defendant repeatedly tells other individuals that he believes he knows which anonymous family members turned him into the FBI and tells people which family members he believes did so.   He interrogates one individual whom he suspects of being W-1, stating, "what's going to happen is I'm going to ask you some questions and you're going to answer…. I'm going to ask you, how did you get in contact with the FBI?"   He also boasts of his actions on January 6, displaying a lack of remorse.   He repeatedly asks if others have seen videos of him on the news, making comments including, "That shit was gangsta right?," "I got mad views on YouTube," and "I am famous."

The remaining factors in § 3142(g) too – the defendant's history and characteristics, and the nature and seriousness of the danger posed by his release – likewise favor detention.   In considering the defendant's history and characteristics, this Court considers "(1) the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol

abuse, criminal history, and record concerning appearance at court proceedings; and (2) whether, at the time of the current offense or arrest, the defendant was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under federal, state, or local law."   *United States v. Taylor*, 289 F. Supp. 3d 55, 69 (D.D.C. 2018).   As noted, the investigation to date has indicated that the defendant has no stable employment, no fixed residence, and limited community ties, and has had various failures to appear noted against him in court proceedings.   As discussed at greater length above, those characteristics, combined with the defendant's use of aliases, multiple IDs, multiple license plates, and concerted efforts to evade detection render the defendant a significant flight risk with "the resources and capabilities" to actualize that risk.   *Munchel*, 991 F.3d at 1283.

The defendant's criminal history, moreover, includes two District of Columbia convictions from 2019 – for Leaving After Colliding/Property Damage and Public Intoxication – as well as a Driving While Under the Influence conviction from 2015 in Virginia.   Those convictions were relatively recent, not dated, and it is concerning that the defendant had just completed probation in mid-September 2020 before reoffending.   Those convictions suggest, moreover, that the defendant has a history relating to drug and alcohol abuse – and indeed, at his arrest on January 30, 2021, law enforcement agents smelled marijuana and observed that the defendant appeared to be under the influence of marijuana.   W-3, the individual who has previously employed the defendant, additionally stated that W-3 had contacted the defendant in January 2021 with the intent to "encourage him to stop drinking and smoking marijuana."   This Court in considering pretrial detention, moreover, "may also consider prior arrests or charges brought against a defendant, even when those actions did not result in convictions." *United States v. Taylor*, 289 F. Supp. 3d 55, 70

(D.D.C. 2018).   Here, although the defendant is relatively young, his brushes with the criminal justice system are many and far-flung.   The defendant has a lengthy arrest history in multiple jurisdictions going back to 2014.   The offenses, moreover, include alleged instances of resisting arrest, assault, and destruction of property, offenses that mirror the alarming conduct in this case and underscore the threat he poses to the community.

There is a reasonable evidentiary basis, moreover, to believe that defendant engaged in additional criminal acts after the events at the U.S. Capitol and thus continues to present a threat to the community.   Local authorities were called to the scene of the defendant's arrest in Denver, PA, after numerous antiques, including jewelry, silverware, and other items valued at thousands of dollars, along with apparent burglary tools like a cut-off saw and wire cutter, were recovered from his motel room.   Those authorities are investigating the defendant for a state-law felony burglary charge committed on January 29, 2021, the day before his arrest, based on those findings as well as surveillance video showing an individual matching the defendant's appearance and wearing the same backpack found in his motel room scaling an approximately eight-foot iron fence to enter the local antiques store from which those antiques were stolen.

At bottom, the seriousness of the risk to public safety posed by the defendant's release cannot be understated.   The defendant was a prominent aggressor who initiated and inflicted violence and destruction from the front of the pack by the Speaker's Lobby doors.   He apparently needed to be restrained, during at least one point during the day, by fellow rioters.   The defendant was involved in not one, but multiple tense interactions with law enforcement officers around the building, and he appears to have invited each one of those confrontations by his own initiative and actions.   And when left to his own devices and impulses, the defendant did not flinch before

shattering windows inches from the stationed officers' faces; weaponizing a helmet to continue punching out those windows; or shattering them still further even after the cries of "Gun!!!" as protesters screamed out about an armed officer standing inside the Speaker's Lobby doors.   A woman was fatally shot climbing through a glass panel that the defendant himself had shattered with a helmet just moments before.   For all the reasons that the defendant's history and characteristics establish a risk of flight, they also establish that the defendant does not have the stabilizing forces or strong community ties that would check his dangerousness and ensure his abidance by the law and the protection of those around him.

Given the foregoing reasons, the government respectfully submits that the presumption of detention should hold and that no conditions will reasonably redress the threat posed by the defendant to others and the community.

## **CONCLUSION**

WHEREFORE, the United States respectfully requests that the Court deny the defendant's

motion to set bond and conditions of release.

Respectfully submitted,

Channing D. Phillips

Acting United States Attorney
D.C. Bar No. 415793


By: _____
Candice C. Wong
D.C. Bar No. 990903
Candice.wong@usdoj.gov
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7849

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2021, I caused a copy of the foregoing motion to be served on counsel of record via electronic filing.

_/s/ Candice C. Wong_____
CANDICE C. WONG
Assistant United States Attorney