# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-190-DLF** |
| **v.** | : | |
| | : | |
| **ZACHARY JORDAN ALAM,** | : | |
| | : | |
| **Defendant.** | : | |

## UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO DISMISS COUNTS THREE, FIVE, SIX, SEVEN, & EIGHT OF THE FIRST SUPERSEDING INDICTMENT

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant Zachary Alam's Motion to Dismiss Counts Three, Five, Six, Seven, and Eight of the First Superseding Indictment. Def't Mtn, Dkt. 47. Those counts charge Alam with civil disorder, in violation of 18 U.S.C. §§ 231(a)(3) and 2, corruptly obstructing an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2, and various acts relating to restricted buildings and grounds, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A), 1752(a)(2) and (b)(1)(A), and 1752(a)(4) and (b)(1)(A).

Alam's motion plows no new ground. Several courts in this district have collectively rejected all of the challenges he rehashes in his motion. As Judge Berman Jackson recently noted with words that apply equally here, "[t]his case is one of many arising out of the events at the United States Capitol on January 6, 2021, and all of the legal challenges [defendant] raises in her motions have been considered and rejected by other courts in this district." *United States v. Williams*, No. CR 21-0618 (ABJ), 2022 WL 2237301, at *1 (D.D.C. June 22, 2022).[1] The same is true here, and the same result should obtain.

---

[1] Citing *United States v. Griffin*, 549 F. Supp. 3d 49, 52–58 (D.D.C. 2021) (18 U.S.C. §§ 1752(a)(1)); *United States v. Sandlin*, 21-cr-88 (DLF), 2021 WL 5865006, at *3–5, *10–13 (D.D.C. Dec. 10, 2021) (challenging charges under 18 U.S.C. § 1512(c)(2)); *United States v.*

## FACTUAL AND PROCEDURAL BACKGROUND

The Court is familiar with the allegations that support the offenses charged in this case from prior filings and hearings.

In brief, Alam's (and others') disruptive and violent conduct culminated in the death of a fellow rioter on January 6, 2021.  He entered the Capitol through a broken window by the Senate Wing Door, just minutes after the initial breach of the building.  He roamed to different areas of the Capitol, at one point throwing an object from one floor down to another floor, at other points yelling at officers and rioters, but in general, fomenting chaos.  He made his way toward the House Chamber, approaching a group of law enforcement officers who were holding back a crowd of rioters in a hallway between Statuary Hall and the House Chamber.  Striding up and

---

*Caldwell*, 21-cr-28 (APM), 2021 WL 6062718, at *4–11 (D.D.C. Dec. 20, 2021) (18 U.S.C. § 1512(c)(2)); *United States v. Mostofsky*, 21-cr-138 (JEB), 2021 WL 6049891, at *8–13 (D.D.C. Dec. 21, 2021) (18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1)); *United States v. Montgomery*, 21-cr-46 (RDM), 2021 WL 6134591, at *4–10, *18–23 (D.D.C. Dec. 28, 2021) (18 U.S.C. § 1512(c)(2)); *United States v. Nordean*, 21-cr-175 (TJK), 2021 WL 6134595, at *4–12, *14–19 (D.D.C. Dec. 28, 2021) (18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1)); *Order, United States v. Reffitt*, 21-cr-32 (D.D.C. Dec. 29, 2021) (18 U.S.C. § 1512(c)(2)); *United States v. McHugh*, 21-cr-453 (JDB), 2022 WL 296304, at *3, *22 (D.D.C. Feb. 1, 2022) (18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2)); *United States v. Grider*, 21-cr-22 (CKK), 2022 WL 392307, at *3–8 (D.D.C. Feb. 9, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Bozell*, 21-cr-216 (JDB), 2022 WL 474144, at *1–7 (D.D.C. Feb. 16, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Robertson*, 21-cr-34 (CRC), 2022 WL 969546, at *3–6 (D.D.C. Feb. 25, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Andries*, 21-cr-93 (RC), 2022 WL 768684, at *3–17 (D.D.C. Mar. 14, 2022) (18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2)); *United States v. Fischer*, 21-cr-234 (CJN), 2022 WL 782413, at *1–4 (D.D.C. Mar. 15, 2022) (18 U.S.C. § 231(a)(3)); *United States v. Puma*, 21-cr-454 (PLF), 2022 WL 823079, at *4–19 (D.D.C. Mar. 19, 2022) (18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1); 18 U.S.C.  § 1752(a)(2)); *United States v. Sargent*, 21-cr-258 (TFH), 2022 WL 1124817, at *2–6 (D.D.C. Apr. 14, 2022) (18 U.S.C. § 231(a)(3)); *United States v. McHugh*, 21-cr-453 (JDB), 2022 WL 1302880, at *2–12 (D.D.C. May 2, 2022) ("*McHugh II*") (18 U.S.C. § 1512(c)(2)); *United States v. Bingert*, 21-cr-91 (RCL), 2022 WL 1659163, at *3–11, *12–15 (D.D.C. May 25, 2022) (18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1)); *United States v. Fitzsimons*, 21-cr-158 (RC), 2022 WL 1698063, at *3–13 (D.D.C. May 26, 2022) (18 U.S.C. § 1512(c)(2)).

yelling "hey, hey, hey," Alam shouted at an officer and pushed into the crowd of rioters.  Within seconds, the officers lost control of the crowd, and the rioters, including Alam, were able to proceed to the House Chamber door.  They yelled, and some attacked the windows in the door and the door itself, clamoring to get in.

Alam left that door and found a different entrypoint to the House Chamber, at a door to the Speaker's Lobby.  As three law enforcement officers stood guard at the door, members were forced to evacuate the House Chamber at the other end of the Speaker's Lobby.  While they did, Alam repeatedly punched, kicked, and struck the glass panels of the doors to the Speaker's Lobby with first his fists, and then a helmet.  At one point, he pushed his body against at least one of the officers guarding the door.  Finally, after he broke the glass out of three glass panels in the door, a woman later identified as Ashli Babbitt climbed through the emptied-out window frame on the right side of the door and was shot.

Alam was arrested approximately seven months ago, on January 30, 2021, and has been detained since his arrest.  Trial is currently set to begin on August 29, 2022, and pursuant to pretrial deadlines set by this Court, Alam filed a motion to dismiss certain counts in the indictment.  *See* Def't Mtn, Dkt. 47.

## DISCUSSION

### I.  **Legal Standard**

Under Rule 7(c)(1), the indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1)(A).  A defendant may move to dismiss an indictment or count thereof for failure to state a claim prior to trial.  *See* Fed. R. Crim. P. 12(b)(3)(B)(v).  "[A]n indictment must be viewed as a whole, and the

allegations must be accepted as true in determining if an offense has been properly alleged." *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011).

The question his motion presents is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *Id.* "An indictment must contain every element of the offense charged, if any part or element is missing, the indictment is defective and must be dismissed." *See United States v. Hillie*, 227 F. Supp. 3d 57, 70 (D.D.C. 2017).

## II.    Alam's Arguments Are Meritless

Alam argues that the civil disorder charge under 18 U.S.C. § 231 is overbroad and unconstitutionally vague. Def't Mtn at 5. He argues that the obstruction charge under 18 U.S.C. § 1512(c)(2) does not prohibit alleged obstruction of the certification of the Electoral College vote, and that the statute on its face is "constitutionally infirm because of its inherent vagueness and arbitrary enforcement." *Id*. at 14. Finally, he argues that the charges under 18 U.S.C. § 1752(a) "fail[] to state a claim" because the Vice President was not "temporarily visiting" the Capitol on January 6, 2021, and because "the restrictions placed on the Capitol were created by the Capitol Police, not the Secret Service." *Id*. at 31-33.

The Court should reject each of his arguments, for the reasons set forth below.

### A.    18 U.S.C. § 231(a)(3) is not void for vagueness

Alam's vagueness attack on Count 3, which charges him with civil disorder, in violation of 18 U.S.C. § 231(a)(3), is baseless. As an initial matter, Alam advances only facial challenges to 18 U.S.C. § 231 (relating to vagueness and overbreadth) that do not depend in any way on its application to this case. The proponent of a facial challenge must establish "that no set of

circumstances exists under which [the challenged statute] would be valid or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010).

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV.  An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)).  To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010).  A provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application.  *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974).  The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

Alam argues that § 231(a)(3) is "replete with vague and imprecise terms that fail to provide a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited."  Def't Mtn at 7.  He points to the phrases "any act to obstruct, impede, or interfere" and "incident to and during the commission of a civil disorder" as being too vague.[2]  *Id*. at 7-8. He also asserts that the absence of a scienter requirement in § 231(a)(3) contributes to its vagueness.  *Id*. at 8-10.

His exact arguments have been considered and rejected by other courts.  Judge Berman Jackson is the most recent member of this Court to reject a vagueness and overbreadth challenge to § 231(a)(3).  *See Williams*, 2022 WL 2237301, at *6-7.  She noted that the defendant's attack on the phrase "any act to obstruct, impede, or interfere" as vague was unpersuasive for several reasons.  First, she observed that the defendant was lifting the phrase out of context, and that once read in context, the number of occasions when the statute could be applied were narrowed considerably.  *Id*. at *4 (quoting *Bronstein*, 849 F.3d at1109.  Second, she reasoned that a violation of § 231(a)(3) did not "depend upon an element that can vary with the eye of the beholder."  *Id*. at *5 (citing *City of Chicago v. Morales*, 527 U.S. 41 (1991)).  Instead,

> the applicability of the statute turns on whether an individual is in fact obstructing, impeding, or interfering with a law enforcement officer who is performing official duties at a specific time: during the commission of a civil disorder.  And while the statute does not specifically define the words "obstruct," "impede," or "interfere," the statutory terms are not subject to wholly subjective judgments, and therefore, the statute does not on its face authorize or encourage discriminatory enforcement."

*See Williams*, at *5 (internal quotations omitted).

Also contrary to Alam's claims, Judge Berman Jackson found that the phrase "incident to and during the commission of a civil disorder" was appropriately defined, with limiting terms.

---

[2] The defendant's argument goes toward overbreadth, but is framed as an argument relating to vagueness.

*Id*.  As she explained, "a *scienter* requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."  *Id*. at *7 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)).  She concluded that § 231(a)(3) "only criminalizes acts performed 'to obstruct, impede, or interfere with' a law enforcement officer," "in other words, the statute requires obstructive intent."  *Id*.; *see also Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969) ("It is true that section 231(a)(3) does not specifically refer to intent, but it only applies to a person who 'commits or attempts to commit any act to obstruct, impede, or interfere' with firemen or law enforcement officers."); *United States v. Mechanic*, 454 F.2d 849, 854 (8th Cir. 1971) (agreeing with *Foran* "that § 231(a)(3) must be construed to require intent").

Other decisions in this District are in accord with *Williams*.  *See Mostofsky*, 2021 WL 6049891, at *8 (rejecting overbreadth challenge to § 231(a)(3)); *Nordean*, 2021 WL 6134595, at *16-18 (§ 231(a)(3) is neither vague nor overbroad); *McHugh*, 2022 WL 296304, at *13 (same); *Fischer*, 2022 WL 782413, at *1–4 (same).

The Court should apply the same analysis here and reject Alam's void-for-vagueness challenge.

### B.    18 U.S.C. § 231(a)(3) is not overbroad

Alam also contends that § 231(a)(3) is "at odds with the protections of the First Amendment."  Def't Mtn at 11.  That claim too is contrary to multiple decisions in this District.  Indeed, every other judge in this District who has addressed this precise claim has denied it.  This Court should do the same.

A criminal law is facially overbroad only if "'a substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'"  *Washington State*

*Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (quoting *New York v. Ferber*, 458 U.S. 747, 769-71 (1982)); *see also Williams*, 553 U.S. at 293; *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972).  A facial overbreadth challenge faces a steep climb when the statute focuses mainly on conduct, as § 231(a)(3) assuredly does.  *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to ... constitutionally unprotected conduct").

Judge Berman Jackson also considered this argument in *Williams*.  She observed that "[i]n the past year, at least four other courts in this district have considered whether section 231(a)(3) is overbroad on its face, and all have concluded it is not."  *Id*. at *6.[3]  Judge Berman Jackson "agree[d] with the reasoning in those decisions."  *Id*.

The reasons are clear.  "First, the statute plainly covers conduct, not speech, as it criminalizes 'any *act* to obstruct, impede, or interfere with' a law enforcement officer engaged in the performance of official duties, and the terms 'obstruct, impede, or interfere with' are all plainly understood and must be supported by the facts in any particular case."  *Id*. (emphasis added).  "Although some 'acts' could also serve an expressive function, and one could come up with a hypothetical scenario in which the alleged interference involved particularly obstreperous speech, the law does not require dismissing a charge merely because there is a possibility that the provision could reach some constitutionally protected activity."  *Id*.  "Since section 231(a)(3)

---

[3] Citing *McHugh*, 2022 WL 296304, at *17; *Mostofsky*, 2021 WL 6049891, at *8–9; *Nordean*, 2021 WL 6134595, at *17; and *Fischer*, 2022 WL 782413, at *3.  Judge Berman Jackson also cited three out of district cases that reached the same result.  2022 WL 2237301, at *6, citing *United States v. Howard*, 21-cr-28 (PP), 2021 WL 3856290, at *11-12 (E.D. Wis. Aug. 30, 2021); *United States v. Phomma*, 561 F. Supp. 3d 1059, 1067-68 (D. Or. 2021); and *United States v. Wood*, 20-cr-56 (MN), 2021 WL 3048448, at *7-8 (D. Del. July 20, 2021).

does not 'make unlawful a substantial amount of constitutionally protected conduct,' it is not overbroad on its face." *Id.* (citing *City of Houston v. Hill*, 482 U.S. 451, 459 (1987)).

In the typical case, a litigant bringing a facial constitutional challenge "must establish that no set of circumstances exists under which the [law] would be valid," or the litigant must "show that the law lacks a plainly legitimate sweep." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (quotation omitted).  In the First Amendment context, a litigant must demonstrate that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.*  Refusing to enforce a statute because of overbreadth concerns is "strong medicine," and courts will refuse to enforce the statute on such grounds "only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

The Eighth Circuit's decision in *Mechanic*, rejecting an overbreadth challenge to § 231(a)(3), is particularly instructive here.  After reasoning that the statutory language "applies only to a person who acts to impede, obstruct, or interfere with an official described in the statute," that court held that "conduct involved here [the massing of a mob that threw stones at an R.O.T.C. building on a college campus to protest the Viet Nam war, followed by rock and bottle throwing at firemen who arrived to quell the disturbance] is not entitled to constitutional protection."  454 F.2d at 852.

Indeed, "[t]he First Amendment has not been extended to protect rioting, inciting to riot, or other forms of physical violence." *Id.* (citing *Foran*, 411 F.2d at 937).  Thus, § 231(a)(3) "does not purport to reach speech of any kind.  It reaches only acts to impede, obstruct, or interfere with police officers and firemen." *Id.*  "[I]t is not just any public disturbance which is the subject of the section, but only public disturbances which (1) involve acts of violence (2) by

assemblages of three or more persons, and which (3) cause immediate danger of or result in injury to (4) the property or person of any other individual." *Id.*

Moreover, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984); *see also Howard*, 2021 WL 3856290, at *11 (rejecting overbreadth claim that "the government perhaps could charge someone who yelled at an officer during a civil disorder and could argue that the yelling was an 'act' that 'attempted to obstruct' an officer performing her lawful duties"). Rather, a defendant must show a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of City Council of City of Los Angeles*, 466 U.S. 789, 801 (1984).

Alam identifies no cases or anything other than one or two bare "hypotheticals." *United States v, Williams*, 553 U.S. 285, 301 (2008). It is no wonder that he cannot find support for his argument: laws such as § 231(a)(3) that are "not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)" are far less likely to present such a danger. *Hicks*, 539 U.S. at 124. Indeed an "overbreadth challenge" to such a law will "[r]arely, if ever … succeed." *Id.*

Alam has given this Court no reason to depart from the unanimous holdings of other judges in this district and elsewhere that § 231(a)(3) is not unconstitutionally overbroad.

**C.      18 U.S.C. § 1512(c)(2) applies to the conduct alleged in the First Superseding Indictment**

Alam also attacks Count Five of the First Superseding Indictment, which charges him with corruptly obstructing, influencing, or impeding an "official proceeding" – *i.e.*, Congress's certification of the Electoral College vote on January 6, 2021 – in violation of 18 U.S.C.

§ 1512(c)(2).  His claim fails, as this Court recognized more than six months ago.  *Sandlin*, 2021
WL 5865006, at *3–5.

In 2002, Congress enacted § 1512(c)'s prohibition on "[t]ampering with a record or
otherwise impeding an official proceeding" as part of the Sarbanes-Oxley Act, Pub. L. No. 107-
204, 116 Stat. 745, 807.

> Section 1512(c)'s prohibition applies to
>
> [w]hoever corruptly--
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or
> attempts to do so, with the intent to impair the object's integrity or availability for
> use in an official proceeding; or
> (2) *otherwise obstructs, influences, or impedes any official proceeding, or*
> *attempts to do so*.

18 U.S.C. § 1512(c) (emphasis added).  Section 1515(a)(1), in turn, defines the phrase "official
proceeding" to include "a proceeding before the Congress."  *Id*. § 1515(a)(1)(B).  By the
statute's plain terms, then, a person violates § 1512(c)(2) when, acting with the requisite *mens
rea*, he engages in conduct that obstructs a specific congressional proceeding, including, as here,
Congress's certification of the Electoral College vote.

Alam argues that "official proceeding," as set forth in the statute, does not include the
Electoral College vote certification.  Def't Mtn at 13-21.  But this Court and many other judges
in this District have considered, in other cases arising out of the events at the Capitol on January
6, 2021, one or more of the arguments he raises.  *See supra* n.1 (citing cases).  Every district
judge to have reached the issue has concluded that Congress's certification of the Electoral
College is an "official proceeding" within the meaning of 18 U.S.C. 1512(c)(2) and that
§ 1512(c)(2) is not unconstitutionally vague.

Furthermore, every reported court of appeals decision to have considered the scope of
§ 1512(c)(2), and all but one of the judges of this Court to have considered the issue in cases

involving January 6, 2021, have concluded that § 1512(c)(2) prohibits obstruction regardless of its connection to documentary or tangible evidence.  And, in any event, even if a nexus to documentary or tangible evidence were required, the allegations in the Indictment, which track the statutory language, more than adequately informed Alam about the charge against him; nothing more was or is required.  *See, e.g.*, *United States v. Williamson*, 903 F.3d 124, 130-131 (D.C. Cir. 2018).

> **1.     The plain text of the statute established that the Joint Session is an "official proceeding."**

To determine the meaning of a statute, a court "look[s] first to its language, giving the words used their ordinary meaning."  *Levin v. United States*, 568 U.S. 503, 513 (2013) (internal quotation omitted).  Section 1515(a)(1)(B), as noted, defines "official proceeding" as a "proceeding before the Congress."

In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is a congressional proceeding, or "a proceeding before the Congress."  Because Section 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete."  *Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation omitted).

Congress's Joint Session to certify the Electoral College vote constitutes a "proceeding" under any interpretation of that term.  In its broadest and most "general sense," a "proceeding" refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior."  *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013) (quoting *Proceeding*, Oxford English Dictionary, available at http://www.oed.com).  Alam seems to acknowledge the force of that definition in this context.  He does not meaningfully contend that Congress's Joint Session to certify the Electoral College vote, which involves a detailed "series of actions"

outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding – and indeed an official proceeding – under that broad definition.

A narrower definition of the term "proceeding" would look to the "legal – rather than the lay – understanding" of the term. *Ermoian*, 752 F.3d at 1170. This narrower definition includes the "business conducted by a court or other official body; a hearing." Black's Law Dictionary, "Proceeding" (11th ed. 2019). Taken with its modifier "official," the term "proceeding" thus "connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170. But even under this narrower definition, Congress's Joint Session to certify the Electoral College vote – business conducted by an official body, in a formal session – would easily qualify.

The formality involved in the certification of the Electoral College vote places it well within the category of an official proceeding, under any reasonable interpretation. Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true for Congress's certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute. Required by law to begin at 1:00 pm on the January 6 following a presidential election, Congress's meeting to certify the Electoral College vote is both a "hearing" and "business conducted by … [an] official body." *See* Black's Law Dictionary, "Proceeding." The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election. 3 U.S.C. § 15. As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection. *Id.* And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall." *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left";

the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform").  Congress's certification of the Electoral College vote, moreover, must terminate with a decision: Congress may not recess until "the count of electoral votes" is "completed," and the "result declared."  *Id.*

In short, under the plain meaning of §§ 1512(c)(2) and 1515(a)(1)(B), Congress's Joint Session to certify the Electoral College vote is a "proceeding before the Congress."  That alone disposes of Alam's contentions.

### 2.	The statutory phrase "proceeding before Congress" is not limited to proceedings solely related to the "administration of justice."

In the face of ordinary understandings of straightforward language, Alam nevertheless argues, Def't Mtn at 19, that the phrase "official proceeding" in § 1512 applies only to proceedings that involve a "hearing before a tribunal affecting the administrative of justice."

His narrow reading of the statute finds no textual support when applied to § 1515(a)(1)(B), which speaks broadly of a proceeding "before the Congress."  Had Congress wanted to impose a definition that more closely resembled a quasi-adjudicative setting (as Alam contends), it needed look only a few provisions away to 18 U.S.C. § 1505.  That provision criminalizes, among other things, the obstruction of (i) "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency; and (ii) "the due and proper exercise of the power of inquiry under which any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees.  18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020).  If Congress wished to similarly limit the obstruction prohibition under § 1512(c)(2) to congressional investigations and the like, it could have enacted language similar to § 1505.

14

Instead, Congress chose different terms, with different meanings.  *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each.  We would not presume to ascribe this difference to a simple mistake in draftsmanship.").  In the statute at issue here, however, Congress enacted broader language ("a proceeding before the Congress") that covers a broader range of proceedings than only the "inquir[ies] and investigation[s]" envisioned in § 1505.  That broader definition includes the Electoral College vote certification that Alam obstructed on January 6, 2021.

None of Alam's contrary arguments have merit.  He cites at length, Def't Mtn at 16-18, the Ninth Circuit's decision in *Ermoian*, 752 F.3d 1165 (9th Cir. 2013).  But *Ermoian* involved a different statutory definition, 18 U.S.C. § 1515(a)(1)*(C)*, and an entirely different issue: whether an FBI investigation counts as "a proceeding before a Federal Government agency which is authorized by law" under § 1515(a)(1)(C).  In *Ermoian*, the Ninth Circuit reasoned at the outset that the term "proceeding" did not "conclusively resolve whether an FBI investigation qualifies" because narrower definitions of the term "would exclude criminal investigations in the field." 752 F.3d at 1170.

This case, which involves a proceeding before Congress and implicates § 1515(a)(1)*(B)* (and not *(C)*), presents no such question.  And, in any event, the Joint Session of Congress to certify the Electoral College vote would satisfy even the narrower formulations of "proceeding" cited in *Ermoian*.  The Joint Session plainly constituted "*business conducted* by a court *or other official body*; a *hearing*," or "[a] legal … process." *Id.* at 1169 (emphasis added).  And there can be no serious dispute that the Joint Session is a "proceeding … authorized *by law*" or that it has

the "sense of formality" that the Ninth Circuit found absent from mere criminal investigations. *Id.* at 1170 (emphasis added).

Alam also notes that other provisions in Chapter 73 "explicitly relate to the administration of justice."  Def't Mtn at 21-22 (citing 18 U.S.C. §§ 1503, 1504, 1507, 1521). That, too, is unpersuasive.  If anything, those neighboring provisions – which criminalize obstruction of other types of investigations and protect judges, jurors, witnesses and the like – underscore how robustly Congress sought to penalize obstructive conduct across a vast range of settings.  That Congress wished to penalize efforts to obstruct everything from a federal audit to a bankruptcy case to an examination by an insurance regulatory official only crystallizes that it is more the acts of obstructing, influencing, or impeding – than the particular type of hearing – that lie at "'the very core of criminality' under the statute[s]."  *Williamson*, 903 F.3d at 131.

This Court long ago rejected Alam's argument.  *See Sandlin*, 2021 WL 5865006, at *4 Nothing in Alam's briefing warrants departing from that well-reasoned decision.

### 3.     In the alternative, Congress's certification of the Electoral College vote would qualify as an adjudicatory proceeding.

In any event, even if the statute required the "administration of justice" gloss urged by Alam, Congress's certification of the Electoral College vote as set out in the Electoral Count Act of 1887 would satisfy it.  The certification of the Electoral College vote involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]."  3 U.S.C. § 15.

The specific Joint Session at issue renders judgment on whether to certify the votes cast by Electors in the presidential election.  Under the Constitution, the Electors create "lists" of the presidential and vice-presidential candidates, which they "sign" and "certify" before sending to

Congress.  U.S. Const. amend. XII.  Congress then decides whether to count those certified lists, or certificates in conformity with the Electoral Count Act.  3 U.S.C. § 15.

As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it.  3 U.S.C. § 15.  And just as a jury does not (barring a mistrial) recess until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result."  3 U.S.C. § 16.  Even under Alam's theory, Congress's certification of the Electoral College vote possesses sufficient "tribunal-like" characteristics to qualify as an "official proceeding," as several judges of this Court have already concluded.  *See Caldwell*, 2021 WL 6062718, at *11 (Mehta, J.); *Nordean*, 2021 WL 6134595, at *6; *McHugh*, 2022 WL 296304, at *9.

### D.   Section 1512(c)(2) Is Not Unconstitutionally Vague

In the alternative, Alam contends that § 1512(c)(2) is unconstitutionally vague.  Def't Mtn at 22-28.  He is incorrect, as this Court and every other judge in this District to have considered the issue has concluded.

### 1.   There is a strong presumption that § 1512(c)(2) is constitutional.

Alam cannot overcome the "strong presumpti[on]" that § 1512(c)(2) is constitutional. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963).  Section 1512(c)(2) does not tie criminal culpability to "wholly subjective" terms such as "annoying" or "indecent" that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604.  Section 1512(c)(2)'s prohibition on "corruptly … obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy."

*Williams*, 553 U.S. at 306.  The statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding.  While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and intent – the state of men's minds – having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'"  *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

Alam's passing reliance on *Johnson* is equally misplaced.  He appears to suggest that, just because the Supreme Court in *Johnson* found that the "residual clause" of the Armed Career Criminal Act ("ACCA") violated due process, the same must be true of the "residual clause" in Section 1512(c)(2).  But any such contention would fail for at least two reasons, as Judge Friedman recently explained.  First, "*Johnson* does not stand for the proposition that any criminal provision with a residual clause is necessarily vague."  *Puma*, 2022 WL 823079, at *12; *cf. United States v. Davis*, 139 S. Ct. 2319, 2327 (2019) (explaining that if the ACCA's residual clause required "a case-specific approach," "there would be no vagueness problem").  Second, "unlike the residual clause of ACCA at issue in *Johnson*, Section 1512(c)(2) does not require the Court to 'imagine the kind of conduct typically involved in a crime' in order to determine whether that crime, in the abstract, met the statutory criteria."  *Puma*, 2022 WL 823079, at *12.  "Rather, a defendant violates Section 1512(c)(2) if his own conduct 'obstructs, influences, or impedes any official proceeding.'"  *Id.*

>    **2.    The existence of a wide range of obstructive conduct does not make § 1512 vague.**

Finally, Alam's attempts to conjure vagueness from the government's charging decisions in particular cases arising out of the events of January 6, 2021, lack merit.  Contrary to his

suggestion, the fact that obstructive conduct can take many forms – and that the appropriate *mens rea* may be inferred from a wide range of actions – does not make the statute unconstitutionally vague, as this Court has concluded.  *See Sandlin*, 2021 WL 5865006, at \*9; *accord Agnew v. District of Columbia*, 920 F.3d 49, 55 (D.C. Cir. 2019); *see also Grider*, 2022 WL 392307, at \*7; *McHugh*, 2022 WL 296304, at \*12; *Nordean*, 2021 WL 6134595, at \*12; *Montgomery*, 2021 WL 6134591, at \*23;; *Griffin*, 549 F. Supp. 3d at 58.  The statute is properly applied to all individuals who, acting with the requisite *mens rea* (*i.e.*, corruptly), either engaged in conduct that obstructed Congress's certification of the Electoral College vote, or aided and abetted such obstructive conduct.

### E.    The 18 U.S.C. § 1752 allegations are sufficiently charged

Counts Six, Seven, and Eight charge violations of 18 U.S.C. § 1752(a)(1), (2) and (4), which prohibit the unlawful entry into, disruptive or disorderly conduct in, and acts of physical violence in, a "restricted buildings or grounds."  A "restricted building or grounds" is a "posted, cordoned off, or otherwise restricted area…where the President or other person protected by the Secret Service is or will be temporarily visiting." 18 U.S.C. § 1752(c)(1)(B).  At the time Alam entered the U.S. Capitol on January 6, 2021, the Vice President, who was protected by the Secret Service, was present.

Alam attacks these counts, arguing that the Vice President could not have been "temporarily visiting" a building in which he had an office, and that the U.S. Secret Service did not restrict the Capitol building on January 6, 2021.  Def't Mtn at 28-33.  Neither argument is persuasive.

### 1.    The Vice President can "temporarily visit" the U.S. Capitol.

19

Contrary to § 1752's plain terms, purpose, and structure, Alam argues that Vice President Pence could not have "temporarily visited" the U.S. Capitol on January 6, 2021, because he had an office there on that day.  He is wrong.  In *United States v. Griffin,* 21-cr-92 (D.D.C. Mar. 22, 2022), this Court denied a motion for judgment of acquittal where a defendant claimed that the Vice President was not temporarily visiting the Capitol on January 6, 2021.  And every other judge in this District to have confronted this issue has concluded that the Vice President was temporarily visiting the Capitol that day.  *See, e.g.*, *Puma*, 2022 WL 823079, at *16-*19 (Friedman, J.); *Andries*, 2022 WL 768684, at *16-*17 (Contreras, J.); *McHugh*, 2022 WL 296304, at *20-*22 (Bates, J.).

The "ordinary meaning" of "temporarily visit" unambiguously includes a trip to one's office.  *Andries*, 2022 WL 768684, at *16 (it is "quite natural to say that a person 'temporarily visits' a place where she has an office.").  The term "temporary" means "[l]asting for a time only; existing or continuing for a limited time; transitory."  *Temporary*, Black's Law Dictionary (11th ed. 2019).  The verb "visit" means, *inter alia,* "to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)" or "to go or come officially to inspect or oversee."  *See* https://www.merriam-webster.com/dictionary/visit.

Putting these definitions together, "someone is 'temporarily visiting' a location if they have gone there for a particular purpose, be it 'business, pleasure, or sight-seeing,' and for a limited time, which could be 'brief' or 'extended' while nonetheless remaining 'temporary.'"  *McHugh*, 2022 WL 296304, at *20.  People commonly go to their offices for one particular purpose (business), and for a limited time, often returning home at the end of the day.  They may return the following day, but there is no reason why one cannot repeatedly "temporarily visit" the same location.  One can "temporarily visit" a place where one has an office.

20

Vice President Pence was physically present at the U.S. Capitol for a particular purpose: he presided over Congress's certification of the 2020 Presidential Election, first in the joint session, and then in the Senate chamber.  While not specifically alleged in the indictment, two other Secret Service protectees (members of the Vice President's immediate family), also came to the U.S. Capitol that day for a particular purpose: to observe these proceedings.  Furthermore, as President of the Senate, Vice President Pence oversaw the vote certification.  Given the presence of the Vice President (and his family members), the U.S. Capitol plainly qualified as a building where "[a] person protected by the Secret Service [was] … temporarily visiting."  18 U.S.C. § 1752(c)(1)(B).

Alam emphasizes § 1752's use of the term "temporarily" and cites cases where either the President or Vice President were "traveling *outside* of the District of Columbia 'visiting' that area for a 'temporary' purpose."  Section 1752, however, does not impose a requirement that the location being temporarily visited be outside of the District of Columbia.  Second, the visit to the U.S. Capitol *was* temporary: Vice President Pence (and his family) had traveled to the U.S. Capitol to oversee and attend the Joint Session of Congress, a proceeding of limited duration.  At the close of the proceeding, they left, confirming the "temporary" nature of their visit.  *See McHugh*, 2022 WL 296304, at *20-21 (citing various dictionary definitions of "temporary" as "for a limited time" and finding that the Vice President can "temporarily visit" the U.S. Capitol).

Alam offers two further observations, both irrelevant.  First, he notes that Vice President Pence "lived and worked" in the District of Columbia.  Def't Mtn at 31.  But § 1752(c)(1)(B) defines the restricted area by reference to "buildings or grounds," not municipal borders.  That Vice President Pence lived and worked in Washington, D.C. does not detract from the fact that he "temporarily visit[ed]" the U.S. Capitol on January 6.  "Simply being in the visitor's

hometown does not mean a place cannot be 'visited.'" *McHugh*, 2022 WL 296304, at *22.

Second, Alam stresses that Vice President Pence had a permanent U.S. Capitol office.  Def't Mtn

at 32.  Section 1752(c)(1)(B), however, defines the restricted area by reference to the location of

the protectee, not his office. When Vice President Pence traveled to the U.S. Capitol on January

6 to oversee the Joint Session of Congress, he was "visiting" the building.  And because Vice

President Pence intended to leave at the close of the session, this visit was "temporar[y]."

Moreover, the U.S. Capitol is not the Vice President's regular workplace; even if "there

is some carveout in § 1752 for where a protectee normally lives or works, it does not apply to

Vice President Pence's trip to the Capitol on January 6, 2021." *McHugh*, 2022 WL 296304, at

*22.

The "carveout" Alam's argument entails, taken to its logical end, would undermine the

government's ability to protect the President and Vice President by deterring and punishing

individuals who seek unauthorized access to the President's or Vice President's location.  It

would restrict § 1752(c)(1)(B)'s application to only locations outside the District of Columbia—

on the view that any visit by the President or Vice President to a location within municipal limits

cannot be "temporary" because they reside in the District of Columbia.  Also, under the

defendant's construction, § 1752(c)(1)(B) would not apply where the President or Vice President

temporarily stayed at their permanent residences in Delaware or California—on the view that

such a trip would not qualify as "visiting."  Nor would it apply to Camp David, where there is a

presidential cabin and office. In another strange scenario, a restricted area could exist when, as

here, the Vice President's family visits the Capitol (because they are Secret Service protectees

without an office there), but not when the Vice President does, affording a higher level of

protection for the family of the elected official than to the elected official himself (or herself).

No support exists for the defendant's effort to insert such large and irrational exceptions into the statute's sweep.  *See Lovitky v. Trump*, 949 F.3d 753, 760 (D.C. Cir. 2020) (courts will avoid a "statutory outcome … if it defies rationality by rendering a statute nonsensical").

Alam's position also defies § 1752's clear purpose.  In drafting § 1752, Congress sought to protect "not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world."  *United States v. Caputo*, 201 F. Supp. 3d 65, 70 (D.D.C. 2016) (quoting *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984)).  To that end, the statute comprehensively deters and punishes individuals who seek unauthorized access to the White House grounds and the Vice President's residence—fixed locations where the President and Vice President live and work, 18 U.S.C. § 1752(c)(1)(A); and also any other "building or grounds" where they (or other protectees) happen to be "temporarily visiting."  18 U.S.C. 1752(c)(1)(B).

Reading § 1752(c)(1)(A) and (c)(1)(B) together protects the President and Vice President in their official homes and wherever else they go.  Interpreting the statute as the defendant suggests would create a gap in § 1752's coverage by removing areas, such as the U.S. Capitol, from protection.  His reading could expose the leaders of the Executive Branch even as they perform their official duties.  That gap is both illogical and contrary to the statutory history of § 1752, where, "at every turn," Congress has "*broadened* the scope of the statute and the potential for liability."  *Griffin,* 2021 WL 2778557, at *5 (D.D.C. July 2, 2021).

All the relevant metrics – plain language, statutory structure, and congressional purpose – foreclose Alam's crabbed reading of § 1752(c)(1)(B).  This Court should reject his approach. In doing so, the Court need not dwell on his cited cases, which do not discuss the "temporarily

visiting" language.  Def't Mtn. at 31-32 (citing *United States v. Bursey*, 416 F.3d 301 (4th Cir.

2005); *United States v. Junot,* 1990 WL 66533 (9th Cir. May 18, 1990) (unpublished); *Blair v.

City of Evansville, Ind.,* 361 F. Supp.2d 846 (S.D. Ind. 2005)).

> **2.**   **18 U.S.C. § 1752 does not require the government to prove that the restricted area was restricted at the Secret Service's direction.**

Alam also wrongly argues that because the Capitol Police, not the Secret Service,

barricaded the area around the Capitol, he should not be charged with violating 18 U.S.C.

§ 1752(a)(1), (2), and (4).  Judges in this District have rightly rejected this contention.  *See, e.g.*,

*Griffin*, 2021 WL 2778557; *Mostofsky*, 2021 WL 6049891, at *12–*13, *Nordean,* 2021 WL

6134595, at *18; *McHugh,* 21-cr-453, ECF No. 51, at 38–40.

> Subsection 1752(c) defines the phrase "restricted buildings or grounds" as
>
> any posted, cordoned off, or otherwise restricted area—
> of the White House or its grounds, or the Vice President's official residence or its
> grounds;
> of a building or grounds where the President or other person protected by the
> Secret Service is or will be temporarily visiting; or of a building or grounds so
> restricted in conjunction with an event designated as a special event of national
> significance.

18 U.S.C. § 1752(c)(1).  The statute then defines the term "other person protected by the Secret

Service" as "any person whom the United States Secret Service is authorized to protect under

section 3056 of this title or by Presidential memorandum, when such person has not declined

such protection."  18 U.S.C. § 1752(c)(2).

By its plain terms, then, § 1752 prohibits the unlawful entry into a restricted or otherwise

cordoned off area where "a person protected by the Secret Service is or will be temporarily

visiting."  *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 98 (D.D.C. 2019), *aff'd* 831 F.

App'x 513 (D.C. Cir. 2021).  Section 1752, in other words, "focuses on perpetrators who

knowingly enter a restricted area around a protectee, not on how it is restricted or who does the restricting." *Griffin*, 2021 WL 2778557, at \*6.

That straightforward analysis has a straightforward application here: a protected person (the Vice President) was present inside the Capitol building or on the Capitol grounds, and that some portion of the Capitol building and grounds was posted, cordoned off, or otherwise restricted, making it a "restricted building or grounds" under § 1752(c)(1).  By engaging in prohibited conduct on those premises, Alam violated 18 U.S.C. § 1752.

Alam nonetheless urges the Court to import an extra-textual requirement that the Secret Service be required to designate the restricted area.  His argument, in addition to finding no support in the text, fails for another obvious reason:  Section 1752 is directed not at the Secret Service, but at ensuring the protection of the President and the office of the Presidency.  *See* S. Rep. 91-1252 (1970).    "Indeed, the only reference in the statute to the Secret Service is to its protectees.  Section 1752 says nothing about who must do the restricting." *Griffin*, 2021 WL 2778557, at \*7; *see also Mostofsky*, 2021 WL 6049891 at \*13 ("The text plainly does not require that the Secret Service be the entity to restrict or cordon off a particular area.").  Alam's reading would have the Court create a "potentially massive procedural loophole" from the statute's "silence." *McHugh,* 21-cr-453, ECF No. 51, at 40.  As with Alam's other claims, the Court should not accept his invitation to strain the applicable statutory language in ways that serve no purpose other than his own hope to avoid accountability for the crimes charged in the indictment.

## CONCLUSION

For the reasons described above, the Court should deny Alam's motion to dismiss in its entirety.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By: _s/ Cindy J. Cho_
CINDY J. CHO
Assistant United States Attorney
NY BAR #4751053
555 4th Street NW
Washington, DC 20530
(317) 246-0107
Cindy.Cho@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 24, 2022, I caused a copy of the foregoing to be served on counsel of record via electronic filing.

*/s/ Cindy J. Cho*
Cindy J. Cho
Assistant United States Attorney