UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| ZACHARY JORDAN ALAM, | Case No. 1:21-cr-00190(DLF) |
| Defendant. | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court depart or vary upwards to sentence Zachary Jordan Alam to 136 months of incarceration, three years of supervised release, $4,484 in restitution, and a mandatory assessment of $655.

## I.    INTRODUCTION

The defendant, Zachary Jordan Alam, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

One of the most violent and aggressive members that day was the defendant. As established at trial, he spent the day antagonizing officers and inciting other rioters, culminating in his repeated violent and forceful attempts to reach congressional members and staffers as they frantically evacuated the House floor.

Alam initially joined a mob of rioters on the West Front of the Capitol building who had breached police lines on the Lower West Terrace. He encouraged and assisted rioters scaling a wall leading up to a landing on the stairs to the Upper West Terrace. After reaching the Upper West Terrace, Alam entered the Capitol building through a broken window next to the Senate Wing Doors, which had been breached just five minutes earlier. He then moved through four floors of the Capitol building, entering offices, kicking a door, harassing officers, and ultimately ending up at the House Main Doors, where he was at the front of a mob of rioters that broke through a police line. At the House Main Doors, the mob came to a halt, blocked by locked and barricaded doors. While most rioters continued trying to breach those doors, Alam broke away from the larger group and went with others around the outside of the House chamber toward the Speaker's Lobby, a separate entrance on the opposite side of the chamber.

After arriving at the Speaker's Lobby Doors, Alam immediately moved to the front of the mob and threw himself against officers guarding the doors. He punched and shattered glass door panels behind the officers while Congressional members and staffers were visibly attempting to

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

flee the House floor. After the officers in front of the door moved to the side, he repeatedly kicked the Speaker's Lobby doors, which had been barricaded on the other side with piled up furniture. Another rioter handed Alam a helmet which he used to cover his fist as he continued to smash the glass panels, completely dislodging the glass from the frames. After the right-side panel was dislodged by Alam, another rioter attempted to climb through the opening and was shot and killed by an officer standing guard on the other side of the Speaker's Lobby doors, just outside of the House chambers where multiple Congressional members and their staffers were still hiding from the mob. This was not enough violence for Alam. As he left the Capitol building, another rioter recorded him stating, "we need guns, bro… we need guns."

Alam, a Washington D.C. resident who had been arrested more than *twenty* times and convicted of a felony prior to his actions in the instant case, fled from the District of Columbia after January 6. He was arrested on January 30, 2021, at a motel in Denver, Pennsylvania. There, investigators found evidence of his flight and his plans to dispose of evidence connecting him to January 6. Among the evidence seized was Alam's journal, which not only recorded his reflections of January 6 but also memorialized his plans to flee and conceal his identity, including journal entries about his plans to set up new bank accounts and use a "burner" phone to conceal his identity and location from law enforcement.

A jury convicted Alam of seven felonies and three misdemeanors for his actions on January 6, and his conduct warrants a significant period of incarceration. The government thus recommends that the Court sentence Alam to 136 months of incarceration. A 136-month sentence reflects the gravity of Alam's conduct in assaulting officers and destroying government property

during the riot, as well as his extensive planning and attempted flight from prosecution for his conduct on January 6.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021, Attack on the Capitol

In addition to the trial exhibits and testimony, the government refers the court to the statement of facts in the Criminal Complaint filed in this case, ECF 1-1, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.    Alam's Role in the January 6, 2021, Attack on the Capitol

#### *Approach to the Capitol*

On January 6, 2021, Alam attended the "Stop the Steal" Rally before walking to the Capitol, where Alam joined a mob of rioters illegally on the west lawn of Capitol grounds. There, he assisted other rioters in scaling barriers propped up as make-shift ladders on the side of the northwest steps. Alam climbed the steps himself and continued to help and encourage others to do the same. Image 1, below, is still from a government exhibit admitted at trial showing Alam assisting rioters scaling the barriers.



*Image 1: Still from Government's Exhibit 403 at 0:10*

### ***Alam's Entry and Movement Through the Capitol Building***

Alam entered the Capitol building at approximately 2:17 p.m., leaping through a broken window adjacent to the Senate Wing emergency exit doors that had been initially breached just 5 minutes prior. Once inside the Capitol, Alam first made his way to the Crypt where he spent time yelling at officers and giving high-fives and hugs to other rioters while celebrating the breach. Here, Alam changed into a black shirt bearing a red and yellow Pirelli logo. Alam also wore a red MAGA baseball cap, which he later wore under a black and tan fur-lined hat.

From the Crypt, Alam used an elevator to access the 4th floor of the Capitol. On the 4th floor, Alam turned down a hallway leading to the Defense Subcommittee of the Committee on Appropriations and attempted to kick in a door in that hallway. Government's Exhibit 404.1 at 3:08. Alam then accessed the 3rd floor via a staircase. On the 3rd floor, Alam threw a red velvet rope, from a balcony, at police officers standing guard at the Rotunda doors the next level down.

Images 2 and 3, below, are stills from a government exhibit admitted at trial showing Alam on the 4th floor and throwing a rope at officers on the 3rd floor.



*Image 2: Still of Exhibit 404.1, with Alam about to lead others on the 4th Floor.*



*Image 3: Still of Exhibit 404.1 showing Alam about to throw a rope down a floor at officers.*

***Alam's Incendiary Actions Outside the House Main Door***

By approximately 2:33 p.m., Alam had worked his way down from the upper floors and walked down a staircase to the 2nd floor at a location which was beyond the furthest point the rioter had yet breached on the House side of that floor. Officers then directed Alam to the other side of a police line which was holding back a large mob of rioters gathering in the Will Rogers corridor, a hallway connecting Statuary Hall to the House Chamber's Main Door. Here the rioters' progress through the Capitol had been temporarily stopped by a line of officers standing guard between the corridor and the House Main Door, which led directly into the House Chamber, where members of Congress and other Congressional personnel remained inside. As the rioters' numbers increased, Alam started to encourage them, yelling "AAAYYYYEEE" to the crowd with his arms above his head. Alam also began to scream obscenities at officers. Image 4, below is a still from a government exhibit admitted at trial showing Alam at the front of the mob of rioters in the Will Rogers corridor.



*Image 4: Still of Exhibit 405 showing Alam taunting an officer guarding the House Main Doors*

A few fellow rioters actually attempted to quiet Alam and push him back in the mob. However, the mob started surging forward with Alam joining. The police line, guarding the House Main Door, was completely overrun. Alam and other rioters surged forward towards the House Main Door in an attempt to enter the House chamber. Image 5, below, is a still from a government exhibit admitted at trial showing Alam's involvement in a conflict between rioters and officers near the House Main Door.



*Image 5: Still of Exhibit 405 showing officers being pushed back toward the House Main Doors*

Alam and the other rioters were unable to breach the House Main Door because officers had had barricaded it with furniture. Image 6, below, is a still from a government exhibit admitted at trial showing officers guarding the House Main Door from inside the House Chamber.



*Image 6: Still of Exhibit 801 showing officers guarding the House Main Doors*

At 2:41 p.m., Alam and others left the House Main Door and headed east, circling around the House chamber, to the Speaker's Lobby—another entry point at the rear of the House chamber that was also guarded and barricaded with furniture.

### *Alam's Violent Attempts to Breach the Speaker's Lobby Doors*

When Alam arrived at the Speaker's Lobby Doors, U.S. Capitol Police (USCP) officers were actively attempting to evacuate congressional members and staffers from the House chamber. The evacuating members and staff were visible through the Speaker's Lobby Doors, which were being defended by three other USCP officers. Image 7, below, is a still from a government exhibit admitted at trial showing Alam's view from outside the Speaker's Lobby Doors as the House chamber was being evacuated.



*Image 7: Still of Exhibit 411.1, at 1:14, from outside the Speaker's Lobby Doors as the House is evacuated.*

Alam intentionally put himself at the front of the mob, where he threatened the USCP officers, yelling "I'm going to fuck you up!" in their faces. Alam pushed against the officers, creating an opening so he could punch the glass panes of the doors. Alam's punches landed near the heads and faces of the officers, shattering three door window panes. All the while, Alam could see members and staff on the other side of the doors fleeing from the rioters. Images 8-9, below, are stills from a government exhibit admitted at trial showing Alam striking the Speaker's Lobby Doors near the heads of officers guarding the Speaker's Lobby.



*Image 8: Still of Exhibit 411.1 showing Alam bumping against officers and punching the glass*



*Image 9: Still of Exhibit 411.1 showing the glass shattered by Alam's repeated punches.*

After shattering the glass panels, Alam turned around and rallied the crowd behind him, announcing that "the problem" was with the House members. Images 10 and 11, below, are stills from a government exhibit admitted at trial showing Alam encouraging rioters outside of the Speaker's Lobby Doors.

11



*Image 10: Still of Exhibit 408.1 as Alam turns to address rioters.*



*Image 11: Still of Exhibit 408.1 as Alam turns to the crowd and gestures to those evacuating behind them.*

After Alam had shattered multiple windows with his fists the three officers moved aside and Alam seized this opportunity to violently kick the doors three times. Image 12, below, is a still from a government exhibit showing Alam kicking the door.



*Image 12: Still of Exhibit 410.1 showing Alam kicking the Speaker's Lobby Doors*

After he finished kicking the door, Alam was given a black helmet by another rioter. Alam used the helmet to cover his right hand and then used the helmet as a bludgeon, to smash the door and the glass panes. Officers positioned behind the House Chamber Doors, who were protecting those still inside, drew their guns in response. Other rioters, observing a weapon, yelled that there was a gun behind the door. Alam was completely undeterred. He continued to smash the last glass pane in the door, eventually opening up a gap large enough that a fellow rioter attempted to climb through the broken window. This rioter was immediately shot.

All said, in the course of just 25 seconds Alam violently kicked the doors three times then smashed the doors and glass panes with the helmet an additional nine times, breaking two glass panes completely out. All the while, Alam's actions exacerbated the chaos, inflaming the mob overall. Images 13-15, below, is a still from a government exhibit admitted at trial showing Alam using a helmet on his fist to smash glass panes on the Speaker's Lobby Doors right before another rioter attempted climb through the window and was shot.

13



*Image 13: Still of Exhibit 410.1 showing Alam smashing a glass panel with a helmet*



*Image 14: Still of Exhibit 408.1 showing Alam breaking a glass panel out of its frame*



*Image 15: Still of Exhibit 408.1 showing Alam breaking the right glass panel out just before another rioter starts to climb through it.*

After the shooting, Alam and the other rioters were repeatedly ordered to leave the building by officers, as officers attempted to render first aid to the shot rioter. Alam eventually complied but as he walked out an exit door, he was captured on video calling out to fellow rioters that "we need guns, bro. We need guns." In total, Alam spent well over 30 minutes inciting the rioters and leading them in violent acts during the civil disturbance in the Capitol building.

### *Alam's Flight from Justice*

Alam understood that his actions at the Capitol on January 6 were criminal. As soon as he returned home, he began planning to flee and conceal his identity. Alam was finally arrested on January 30, 2021, at a motel in Denver, Pennsylvania. There, investigators found evidence of his flight and his plans to dispose of evidence connecting him to January 6, 2021. Among the evidence seized was Alam's journal. In journal entries, Alam memorialized his plans to flee and conceal his identity.

Journal entries from January 10, 18, and 19, 2021, reveal Alam's planned flight and attempts to conceal his identity. For "Sun 1/10/21," Alam wrote, "activate burner," indicating that four days after the events at the U.S. Capitol, he began using an untraceable "burner" phone to help conceal his identity and location. That "burner" appears to refer to the Verizon flip phone that agents recovered during the search of Alam's motel room. Below that entry, which was crossed out (implying that step had been accomplished), apparently referencing his actual cellphone, Alam wrote "turn off phone. Put in Plastic bag. Put in tire. Stash tire." These entries plus the purchase of the "burner," revealed that Alam wanted to conceal his identity and location from authorities who he believed were looking for him. Alam's other notes from January 10 further referred to his intent to avoid detection: "buy crypto [currency]" and "consolidate crypto" and get "ID's" and "clothes" from "storage."

In a journal entry labeled "Mon 1/18/21" he planned to "open new bank acct" and "Delete Pics on FB." In a later entry he wrote, "re-allocate funds to decentralized assets," "Trade truck for car," and "VPN on Mac."[2]  Alam also was in possession of a magazine called "Off the Grid" with a front cover caption "Riot Response-Survive and Succeed During Civil Unrest."

---

[2] A virtual private network (VPN) is a mechanism for creating a secure connection between a computing device and a computer network, or between two networks, using an insecure communication medium such as the public Internet. VPNs cannot make online connections completely anonymous, but they can increase privacy and security by encrypting all communication between remote locations over the open Internet. https://en.wikipedia.org/wiki/Virtual_private_network k

### III.    THE CHARGES AND JURY VERDICT

On July 12, 2023, a federal grand jury returned a second superseding indictment charging Alam with 11 counts[3], including Assaulting, Resisting or Impeding Certain Officers (18 U.S.C. § 111(a)(1)), Civil Disorder (18 U.S.C. § 231(a)(3)), Destruction of Government Property (18 U.S.C. § 1361), Obstruction of an Official Proceeding and Aiding and Abetting, (18 U.S.C. §§ 1512(c)(2) and 2, Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (18 U.S.C. §§ 1752(a)(1), (b)(1)(A)), Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (18 U.S.C. §§ 1752(a)(2), (b)(1)(A)), Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon (18 U.S.C. §§ 1752(a)(4), (b)(1)(A)), Disorderly Conduct in a Capitol Building (40 U.S.C. § 5104(e)(2)(D)), Act of Physical Violence in the Capitol Building or Grounds (40 U.S.C. § 5104(e)(2)(F)), and, Parading, Demonstrating, or Picketing in a Capitol Building (40 U.S.C. § 5104(e)(2)(G)). On September 12, 2023, a jury found Alam guilty on all counts. ECF 109.

### IV.    STATUTORY PENALTIES

Alam now faces sentencing on all ten counts listed above. As noted by the Draft Presentence Report issued by the U.S. Probation Office, the defendant faces up to the following penalties:

- Count 1 (Assaulting, Resisting, or Impeding Certain Officers): Up to 8 years imprisonment, a term of supervised release of 3 years, a fine of up to $250,000, and a mandatory special assessment of $100.

---

[3] Prior to trial the Court dismissed Count Two of the second superseding indictment on the government's motion.

- Count 3 (Civil Disorder): Up to 5 years imprisonment, a term of supervised release of 3 years, a fine of up to $250,000, and a mandatory special assessment of $100.

- Count 4 (Destruction of Government Property): Up to 1 year imprisonment, a term of supervised release of 1 year, a fine of up to $100,000, and a mandatory special assessment of $25.[4]

- Count 5 (Obstruction of an Official Proceeding and Aiding and Abetting): Up to 20 years imprisonment, a term of supervised release of 3 years, a fine of up to $250,000, and a mandatory special assessment of $100.

- Count 6 (Entering and Remaining in a Restricted Building or Grounds With a Deadly or Dangerous Weapon: Up to 10 years imprisonment, a term of supervised release of 3 years, a fine of up to $250,000, and a mandatory special assessment of $100.

- Count 7 (Disorderly and Disruptive Conduct in a Restricted Building or Grounds With a Deadly or Dangerous Weapon) Up to 10 years imprisonment, a term of supervised release of up to 3 years, a fine of up to $250,000, and a mandatory special assessment of $100.

- Count 8 (Engaging in Physical Violence in a Restricted Building With a Deadly or Dangerous Weapon): Up to 10 years imprisonment, a term of supervised release of 3 years, a fine of up to $250,000, and a mandatory special assessment of $100.

- Count 9 (Disorderly Conduct in a Capitol Building): Up to 6 months imprisonment, a term of probation of up to 5 years, a fine of up to $5,000, and a mandatory special assessment of $10.

- Count 10 (Act of Physical Violence in the Capitol Building): Up to 6 months imprisonment, a term of probation of up to 5 years, a fine of up to $5,000, and a mandatory special assessment of $10.

- Count 11 (Parading, Demonstrating, or Picketing in a Capitol Building): Up to 6 months imprisonment, a term of probation of up to 5 years, a fine of up to $5,000, and a mandatory special assessment of $10.

---

[4] Alam was convicted of this offense at the misdemeanor level at trial.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Between the filing of the PSR and the filing of this sentencing memorandum, the D.C. Circuit decided *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024). *Brock* held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not apply to Congress' certification of electoral college votes. *See id.* at *8. Accordingly, the enhancement in U.S.S.G. § 2J1.2(b)(2), which requires a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice" does not apply where a defendant interfered solely with the certification of electoral college votes. U.S.S.G. § 2J1.2(b)(2); *Brock*, 2024 WL 875795, at *15. This holding also precludes application of the eight-level enhancement in U.S.S.G. § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," to defendants who interfered solely with Congress' certification of electoral college votes. It does not, however, preclude appropriate departures in light of the aggravating nature of this case, and January 6 obstruction cases, overall, as discussed below.

Because the PSR applied one of the enhancements in calculating Alam's total offense level, that calculation is no longer accurate. The government now submits its proposed calculation for all offenses of conviction as follows.

**Count One: 18 U.S.C. § 111(a)(1)—Assaulting, Resisting, or Impeding Certain Officers (Alam's throwing himself against officers as he smashed the windows behind them with his fists)**

The Statutory Index references two guidelines for 18 U.S.C. §111, U.S.S.G. §§ 2A2.2 (Aggravated Assault) and 2A2.4 (Obstructing or Impeding Officers). The guidelines direct that, if Appendix A lists more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* § 1B1.2 N.1. Here, the most applicable guideline is U.S.S.G. 2A2.4 (Obstructing or Impeding Officers).

| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1): "If (A) the offense involved physical contact … increase by 3 levels."<br><br>Alam made physical contact with three officers. Alam pushed against the officers with his body as he punched out the glass windows of the doors immediately behind the officers' heads. |
| Cross Reference | See below | U.S.S.G. §2A2.4(c) directs that the cross-reference in §2A2.2 applies "if the conduct constituted aggravated assault."<br>"Aggravated assault," under comment 1 to §2A2.2 "means a felonious assault that involved . . . (D) an intent to commit another felony."<br><br>Alam's assault constituted a felonious assault because it involved the intent to commit another felony. Alam's assault on law enforcement was directly related to his participation in and support of the civil disorder and obstruction. Because the felonious assault was committed with the intent to commit another felony, i.e., to obstruct the official proceeding (in violation of 18 U.S.C. § 1512(c)(2)) and to obstruct officers during the civil disorder (in violation of 18 U.S.C. § 231(a)(3)), the assault also constituted an aggravated assault pursuant to U.S.S.G. § 2A2.2 cmt. n.1(D). |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2 |

20

| Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b): If the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable guideline is from Chapter Two, Part A (Offenses Against the Person), increase by 6 levels.<br><br>The officers Alam assaulted were from the USCP. They wore clearly marked uniforms and gave orders for rioters to stop. Alam actions made it clear he was willing to go through officers to access the House, thus he was motivated by their status as police officers. |
|---|---|---|
| Total | 20 | |

**Count Three: 18 U.S.C. § 231(a)(3) --Obstructing Officers During a Civil Disorder and Aiding and Abetting**

Since there is no applicable Chapter Two Guideline for this offense in the Statutory Appendix, use "the most analogous guideline." U.S.S.G. § 2X5.1. Here, that is U.S.S.G. § 2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1): "If (A) the offense involved physical contact … increase by 3 levels."<br><br>See analysis in Count 1. |
| Cross reference | See below. | U.S.S.G. § 2A2.4(c)(1): "If the conduct constituted aggravated assault, apply § 2A2.2 (Aggravated Assault)."<br><br>The Application Notes to Section 2A2.2 define "aggravated assault" as a "a felonious assault that involved . . . (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony." U.S.S.G. § 2A2.2 cmt. n.1.<br><br>*See analysis in Count 1.* |

| Base Offense Level | 14 | U.S.S.G. §2A2.2(a) (Aggravated Assault) |
|---|---|---|
| Special Offense Characteristic: Dangerous Weapon | +4 | U.S.S.G. § 2A2.2(b)(2)<br><br>Alam used a helmet to bash the windows out of the Speaker Lobby Door. This was one of the most fraught and dangerous moments in the January 6 attack on the Capitol. While Alam was striking the glass, members of Congress had not fully evacuated the House Chambers, and some members of Congress were just yards away from Alam and the other rioters. Other House members in the Upper House Chamber had not yet been able to evacuate and had sheltered in-place. Alam's actions in breaking the glass with his fists and then the helmet further incited the mob and had he and other rioters broken through the door, would have placed members of Congress in even more serious risk of injury. |
| Chapter Three Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b): If the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable guideline is from Chapter Two, Part A (Offenses Against the Person), increase by 6 levels.<br><br>*See analysis in Count 1.* |
| Total | 24 | |

**Count Four: 18 U.S.C. § 1361-Destruction of Property**

| Base offense level | 6 | U.S.S.G. §2B1.1(a)(2) |
|---|---|---|
| Special Offense Characteristic: possession of a dangerous weapon | 14 | U.S.S.G. §2B1.1(b)(16)(A) & (B): "If the offense involved (A) the conscious or reckless risk of death or serious bodily injury or (B) possession of a dangerous weapon (including a firearm) in connection with the offense, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14."<br><br>Alam used a helmet to bash the windows out of the Speaker Lobby Door. The moment when Alam began to bash the glass window of the Speaker Lobby Door was one of the most fraught and dangerous moments in the January 6 attack on the Capitol. While Alam was striking the glass, members of Congress had not fully evacuated |

| | | the House Chambers, and some members of Congress were just yards away from Alam and the other rioters. Other House members in the Upper House Chamber had not yet been able to evacuate and had sheltered in-place. Alam's actions in breaking the glass with the helmet and with his fists incited the mob and had he and other rioters broken through the door, would have placed members of Congress in even more serious risk of injury. |
|---|---|---|
| Total offense level | 14 | |

**Count Five: 18 U.S.C. § 1512(c)(2)—Obstruction of an Official Proceeding**

The Statutory Index lists U.S.S.G. §2J1.2 as the guideline for 18 U.S.C. §1512(c).

| Base offense level: | 14 | U.S.S.G. § 2J1.2(a) |
|---|---|---|
| Total | 14 | |

**Count Six: 18 U.S.C. § 1752(a)(1), (b)(1)(A)—Entering or Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon**

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass). The Guidelines direct that, if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* §1B1.2 n.1. Here, the most applicable guideline is § 2B2.3.

| Base Offense Level: | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|
| Specific Offense characteristic | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): the trespass occurred "at any restricted building or grounds." On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). |
| Specific Offense characteristic | +2 | U.S.S.G. § 2B2.3(b)(2): a dangerous weapon was possessed.<br><br>The jury's conviction necessarily means Alam possessed a dangerous weapon in the restricted area of the Capitol complex on January 6, 2021. |

| | | Alam possessed and used a helmet in a dangerous and deadly manner to smash through the windows of the Speaker's Lobby doors. |
|---|---|---|
| Cross Reference | See below. | U.S.S.G. § 2B2.3(c)(1): "If the offense was committed with the intent to commit a felony offense, apply § 2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above." |
| Base Offense Level (adjusted) | 14 (from Count Three) | U.S.S.G. § 2X1.1(a): "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." <br><br> Alam entered and remained in the restricted area of the Capitol building for the purpose of obstructing officers during a civil disorder. The substantive offense is thus Count Three. Accordingly, the guideline for Count Three (U.S.S.G. § 2A2.2) applies here. <br><br> *See* Count Three above for detailed explanations of the applicability of the specific offense characteristics in U.S.S.G. § 2A2.2. |
| Special Offense Characteristic: Dangerous Weapon | +4 | U.S.S.G. § 2A2.2(b)(2)(B): "a dangerous weapon (including a firearm) was otherwise used." <br><br> *See also the analysis in Count 3.* |
| Total | 18 | |

**Count Seven: 18 U.S.C. § 1752(a)(2), (b)(1)(A)—Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon**

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass). The Guidelines direct that, if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* §1B1.2 n.1. Here, the most applicable guideline is § 2A2.4.

| Base/Total Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If (A) the offense involved physical contact … increase by 3 levels." <br><br> Alam committed an assault while engaging in disorderly and disruptive conduct on restricted Capitol grounds which involved physical contact when he pushed against officers guarding the Speaker's Lobby and punched around their heads and faces. |
| Cross Reference | See below | U.S.S.G. §2A2.4(c) directs that the cross-reference in §2A2.2 applies "if the conduct constituted aggravated assault." <br> "Aggravated assault," under comment 1 to §2A2.2 "means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony." <br><br> *See analysis in Count 1.* |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2 |
| Special Offense Characteristic: Dangerous Weapon | +4 | U.S.S.G. § 2A2.2(b)(2)(B): "a dangerous weapon (including a firearm) was otherwise used." <br><br> The Jury's guilty verdict on Count Six established that Alam used or carried a dangerous weapon. *See* 18 U.S.C. § 1752(b)(1)(A) (punishing the defendant for "during and in relation to the offense, us[ing] or carri[ng] a deadly or dangerous weapon or firearm"). In this case, Alam used the helmet to smash the windows. *See* U.S.S.G. § 1B1.1 cmt. n.1(E). <br><br> *See also the analysis in Count 3.* |
| Total | 18 | |

**Count Eight: 18 U.S.C. § 1752(a)(4), (b)(1)(A)— Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon**

The Statutory Appendix lists two guidelines for a Section 1752 offense, U.S.S.G. §2A2.4 (Obstructing or Impeding Officers) and §2B2.3 (Trespass). The Guidelines direct that, if Appendix

25

A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct

charged in the count of conviction. *See* §1B1.2 n.1. Here, the most applicable guideline is § 2A2.4.

| Base/Total Offense Level: | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(A): "If (A) the offense involved physical contact … increase by 3 levels."<br><br>See analysis above. |
| Specific Offense Characteristic | +3 | U.S.S.G. § 2A2.4(b)(1)(B): If "(B) a dangerous weapon (including a firearm) was possessed and its use was threatened, increase by 3 levels."<br><br>See analysis above. |
| Cross Reference | See below | U.S.S.G. §2A2.4(c) directs that the cross-reference in §2A2.2 applies "if the conduct constituted aggravated assault."<br><br>"Aggravated assault," under comment 1 to §2A2.2 "means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury with that weapon; (B) serious bodily injury; . . . or (D) an intent to commit another felony."<br><br>*See analysis in Count 1.* |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2 |
| Specific Offense Characteristic | +4 | U.S.S.G. § 2A2.2(b)(2)(B): "a dangerous weapon (including a firearm) was otherwise used."<br><br>*See analysis above for Count 3.* |
| Chapter Three Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b)<br><br>The victims of Alam's physical violence include MPD Officers Yetter, Lively, and Lanciano, who are government officers. Alam's conduct was motivated by their status as police officers who were doing their job, attempting to clear the rioters from the Capitol building and grounds.<br><br>*See the U.S.S.G. § 3A1.2(c)(1) analysis in Count 1.* |
| Total | 24 | |

**Counts Nine, Ten and Eleven: 40 U.S.C. § 5104(e)(2)(D), (F), and (G)—Disorderly Conduct, Physical Violence and Parading, Demonstrating, or Picketing in a Capitol Building or Grounds**.

Counts Nine, Ten, and Eleven are Class B misdemeanors to which the Sentencing Guidelines do not apply. *See* USSG §§ 1B1.2(a), 1B1.9; 18 U.S.C. § 3559(a)(7); 40 U.S.C. § 5109(b).

**Grouping Analysis**

Under U.S.S.G. § 3D1.2, "closely related counts" group.

Group 1

Counts One, Three, and Eight group under U.S.S.G. §3D1.2(b) because they involve the same victim—USCP officers at the Speaker's Lobby door—and similar acts "connected by a common criminal objective"—assaulting and obstructing officers trying to protect the House floor. Counts Three and Eight have the highest offense level for the group (24), and accordingly, the offense level for Group 1 is 24.

Group 2

Counts Five, Six, and Seven group under U.S.S.G. §3D1.2(b) because they involve the same victim—Congress—and similar acts "connected by a common criminal objective" – obstruction through trespass and disruptive conduct. Counts Six and Seven have the highest offense level for the group (18), and accordingly, the offense level for Group 2 is 18

Group 3

"Group 3" consists of Count Four and involves the Capitol Architect as a victim.

**Combined Offense Level**

Groups One, Two, and Three will all group under U.S.S.G. § 3D1.2(c) because Count Four embodies conduct (the use of the helmet to bash the windows out of the Speaker Lobby Door) that serves as a specific offense characteristic (use of a dangerous weapon, pursuant to U.S.S.G. § 2A2.2(b)(2)(B)) to counts in Group 1 (Counts Three and Eight) and Group 2 (Counts Six and Seven). Therefore, the combined offense level is 26.

**Request for   a Six Level Departure**

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c) and § 1B1.1, cmt. (background). The Guidelines apply to a "heartland of typical cases." *Koon v. United States*, 518 U.S. 81, 94-95 (1996). A "departure" is based on "the framework set out in the Guidelines," while a "variance" is imposed "outside the guidelines framework" based under the applicable 18 U.S.C. § 3553(a) factors taken as a whole. *United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018) (cleaned up). Specific departure statements reflect Commission guidance on what makes a case "atypical" and when departures are "encouraged." *Koon,* 518 U.S. at 94-95.

*Departure Pursuant to U.S.S.G. § 5K2.7*

Following *Brock*, the enhancements under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2) no longer apply. But that decision does not undercut the severity of Alam's crime. If anything, assaulting officers and the Capitol in an attempt to stop Congress from certifying a presidential election is far more serious than interfering with a routine court proceeding. *See Brock*, 2024 WL 875795, at *15 ("interference with  one stage of the  electoral college  vote-counting process . . . no doubt

endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work"). Although the D.C. Circuit has held that §§ 2J1.2(b)(1)(B) and (b)(2) do not technically apply to the certification of the electoral vote count, that does not prevent this Court from considering how the uniquely horrifying events of January 6 factor into an appropriate sentence. Precisely because the D.C. Circuit held, in *Brock*, that the Sentencing Guidelines do not account for this crucial factor, the Court should depart or vary to impose the government's requested sentence. *See e.g.*, *United States v. Bender*, 21-cr-508-BAH, ECF 161 at 3 n.1 ("The D.C. Circuit issued an opinion on March 1, 2024 in *United States v. Brock*, No. 23-3045, holding that the sentencing enhancement at U.S.S.G. § 2J1.2(b)(2) does not apply to convictions under 18 U.S.C. § 1512(c)(2) for conduct disrupting Congress's counting and certification of the electoral college votes on January 6, 2021, but that decision does not influence the outcome in this case, since *the Court would have varied upwards by at least three offense levels to account for the significant disruption of a critical and important governmental function as a result of defendants' offense conduct if the specific offense characteristic at U.S.S.G. § 2J1.2(b)(2) did not apply.*") (emphasis added). Indeed, pursuant to *Brock* – a technical dispute over the interpretation of a specific offense characteristic – a person who obstructed justice during a routine court proceeding, causing substantial interference, and even using violence or the threat of such violence, would receive a vastly higher punishment than a person who corruptly intended to stop a proceeding involving the democratic transfer of power inherent to the U.S. Constitution. That alone warrants an upward departure.

Chapter 5, Part K of the Guidelines "identifies some of the circumstances that the Commission may have not adequately taken into consideration in determining the applicable guideline range," which may warrant a departure. U.S.S.G. § 5K2.0(a)(2)(A). One such circumstance is when an offense results in "a significant disruption of a governmental function." U.S.S.G. § 5K2.7.[5] A departure under this guideline is warranted in "unusual" circumstances where the Guidelines do not reflect the appropriate punishment for the offense. *Id*. In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected." *Id*.

Although by its own terms § 5K2.7 "ordinarily" does not provide for an upward departure when the offense involves obstruction of justice, the obstruction of the Electoral College certification on January 6, 2021, is the type of unusual circumstance that the Sentencing Commission could not have anticipated and that warrants an upward departure. As the commentary explains, departure under § 5K2.7 is appropriate if the disruption of a governmental function is "substantial," meaning "substantially in excess" of the disruption ordinarily involved in an obstruction offense. *See* § 5K2.0 cmt. 3(B)(ii). Those who obstructed the certification proceedings on January 6 targeted the peaceful transfer of power, one of the fundamental and foundational principles of our democracy. *See* ECF No. 60. They were part of a mob that injured more than one

---

[5] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

hundred police officers and resulted in more than 2.9 million dollars in losses.[6] Defendants like Alam "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *Brock*, 2024 WL 875795, at *15. It was an unprecedented day in American history. Surely few, if any, disruptions of governmental functions have been more "substantial," and it was a disruption far "in excess of . . . that which ordinarily is involved in" an obstruction offense (such as impeding a single judicial proceeding). § 5K2.0(a)(3); *id.* cmt. 3(B)(ii). But, following *Brock*, the seriousness of the crimes committed by defendants like Alam are not adequately captured by the applicable Guideline, § 2J1.2. At least one judge has already imposed § 5K2.7 even before *Brock*'s issuance. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours").[7]

---

[6] Given the dangerous circumstances created by the riot, the Court could also depart under § 5K2.14 in addition to, or as an alternative to, departing under § 5K2.7. Section 5K2.14 provides for a departure if "national security, public health, or safety was significantly endangered." The assault on the Capitol endangered the safety of the public, police, and elected officials in a way not already captured by Alam's guidelines range, so a departure would be appropriate. *Cf. United States v. Calloway*, No. 21-3057, 2024 WL 925790, at *3 (D.C. Cir. Mar. 5, 2024) (affirming departure under § 5K2.14 where district court found that the defendant "created a serious risk that multiple individuals could have been killed or injured"). It is hard to conceive of a more dangerous situation created by Alam and his mob than that which resulted in the evacuation of members of the U.S. Congress and the shooting of another person in the U.S. Capitol.

[7] If the Court does apply a departure, the government requests that the Court also specify that it would have imposed the same sentence as a variance. *See United States v. Brevard*, 18 F.4th 722, 728–29 (D.C. Cir. 2021) (upholding the district court's sentence where the departure was erroneously applied but the district court indicated that it was also imposing the sentence as a variance).

If the Court decides not to apply § 5K2.7, an upward variance to the government's recommended sentence is warranted to achieve an appropriate sentence under the § 3553(a) sentencing factors. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up).

Here, an upward variance is warranted to account for the unique nature and circumstances of the offense and to reflect the seriousness of the offense. As discussed throughout this memorandum, Alam's obstruction of justice on January 6 was a serious offense that attacked the fundamentals of American democracy. As Judge McFadden aptly noted in a pre-*Brock* sentencing hearing:

> Regardless of whether the 'administration of justice' language actually applies to this situation, *I have no doubt that the Commission would have intended for this to apply to substantial interference with an official proceeding like a certification process, which is itself more significant than almost any court proceeding…* [Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources.

*United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87 (emphasis added).

The specific facts and circumstances of Alam's case further (discussed in more detail below) support an upward variance to 136 months' incarceration. *See United States v. Fonticoba*, 21-cr-368 (TJK), Sent'g Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a *significant* upward variance would be warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself") (emphasis added); *see also United States v. Bender, et al.*, 21-cr-508 (BAH), Memorandum Opinion (March

6, 2024), ECF 161 at 3 n.1. Accordingly, the government requests that the Court vary upwards by approximately four levels in order to give effect to "the concerns underlying the Government's requests for these enhancements under the § 3553(a) factors at sentencing." *See United States v. Seefried*, 639 F. Supp. 3d 8, 20 (D.D.C. 2022).

<u>*Upward Departure under U.S.S.G. § 3A1.4, Note 4*</u>

Separately, the government's request for a departure is authorized under a different provision of the guidelines, and we seek an additional two-level departure to account for not only the substantial disruption of government, but the threatening, violent, and horrific conduct intended to coerce government. Section 3A1.4 of the Guidelines provides for an enhanced offense level and increased criminal history category when the offense was "a felony that involved, or was intended to promote, a federal crime of terrorism" as that term is defined by 18 U.S.C. § 2332b(g)(5). That statutory definition, in turn, involves two requirements: (1) that the offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"; and (2) that the offense is one of the enumerated crimes listed in 18 U.S.C. § 2332b(g)(5)(B).

In this case, Alam was charged in Count 4 of the second superseding indictment with a felony violation of 18 U.S.C. § 1361 (Destruction of Government Property). Although charged with the felony violation, which required a jury finding that the damage exceeded $1,000, witness availability limitations during trial resulted in the United States being unable to present evidence as to the exact value of the damage, which was $2,484. *See* Attachment A. Without evidence of a specific damage value having been presented to the jury at trial they deliberated on, and found

Alam guilty of, a misdemeanor violation of 18 U.S.C. § 1361. While a misdemeanor conviction of §1361 does not qualify for an adjustment under Section 3A1.4, the government asserts that an upward departure under §3A1.4 cmt. n.4(A) ("Note 4"), would be warranted for Alam for his counts of conviction given the specific facts of this case.

Note 4 states that even where defendants are not convicted of an offense enumerated in 18 U.S.C. § 2332b(g)(5), an upward departure is "warranted" if the defendants' "offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id.*, cmt. n.4(A). When it adopted Note 4, the Sentencing Commission explained that it is "an *encouraged, structured upward departure,*" the purpose of which is to provide courts with "a viable tool to account for the harm involved during the commission of these offenses on a case-by-case basis" and to "make[] it possible to impose punishment equal in severity to that which would have been imposed if the § 3A1.4 adjustment actually applied." Sentencing Guidelines, App. C, amend. 637 (2002) (emphasis added).

The defendant's felony offenses of Assaulting, Resisting or Impeding Certain Officers (Count One), Interference with Officers During a Civil Disorder (Count Three), and Obstruction of an Official Proceeding (Count Five) are not enumerated under 18 U.S.C. § 2332b(g)(5), but these offenses were clearly "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4, cmt. n.4(A). As his conviction and the underlying evidence reflect, the defendant attempted to, and temporarily did, prevent Congress from certifying the 2020 Electoral College vote and did physically prevent Members of Congress from performing their constitutional duties inside the

Capitol building, all through the threatened and actual use of force, directed at police and legislators alike.

Application of Note 4 to Alam's conduct is entirely consistent with the application of Note 4 in this district and by other courts around the country. Here, for example, Judge Mehta applied upward departures ranging from one to six levels under Note 4 to all eight of the Oathkeepers defendants he has sentenced to date in *United States v. Rhodes, et al.*, No. 22-cr-15. Even more recently, Judge Mehta applied a one-level upward departure under Note 4 to Audrey Southard-Rumsey, who was convicted of interfering with law enforcement officers during the commission of a of civil disorder, assaulting law enforcement officers, and obstructing an official proceeding in connection with her rampage through the Capitol on January 6. *United States v. Southard-Rumsey*, No. 21-cr- 387.

Alam's conduct as compared to Southard-Rumsey's, *see infra* VI(F), is markedly more calculated, direct, violent, and imminently likely to intimidate and coerce. Alam not only encouraged and assisted other rioters, taunted, and harassed officers, and impeded them in their duties throughout his day at the Capitol, but he ultimately worked his way to within feet of the very government officials whose activities he intended to retaliate against. And when he got there, he yelled out "I'm going to fuck you up!" then repeatedly slammed his fists into the glass panels behind the heads of the officers guarding the final set of doors protecting Congressional members. After doing that he turned to the other rioters and incited them further, pointing to the congressional members and staffers evacuating and saying that they were "the problem." He then kicked at the doors and then smashed the doors nine times with a helmet, ultimately creating a pathway for

rioters to breach the final physical barrier between them and the lawmakers. Alam's actions fall squarely within the very conduct at the heart of Note 4.

Alam's convictions provide strong support for the application of Note 4. Alam's misdemeanor conviction for Destruction of Government Property encompasses the same criminal *mens rea* as the felony offense, which is specifically included as a qualifying offense for an 3A1.4 upward adjustment the under 18 U.S.C. § 2332b(g)(5). Had Alam been appropriately convicted of §1361 for his destruction of valuable property, the 3A1.4 should have applied. Applying 3A1.4 results in an offense level of 32 and a criminal history category of VI. The defendant's sentencing guidelines range therefore would have been 210 to 262 months. The government's four-level request to account for this discrepancy on value and thus, appropriately account for the gravity of his conduct, is thus immeasurably reasonable.

As this Court knows, Alam was also found guilty of three additional offenses which involved physical violence and/or a dangerous weapon – Count 7 (Disorderly and Disruptive Conduct in a Restricted Building or Grounds With a Deadly or Dangerous Weapon), Count 8 (Engaging in Physical Violence in a Restricted Building With a Deadly or Dangerous Weapon), and Count 10 (Act of Physical Violence in the Capitol Building). Each of these offenses was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." §3A1.4 cmt. N.4(A). Alam kicked at the doors and smashed in the windows which comprised the final barrier between the rioters and the House members whose certification vote he was attempting in stop. These violent acts cannot be better described than acts of intimidation and coercion. And they were specifically directed at the very individuals

Alam yelled out were "the problem" and could see fleeing through the glass panels which he then shattered. Other courts have applied Note 4 and, specifically, Note 4(A)—relating to offenses that are not enumerated in 18 U.S.C. § 2332b(g)(5)(B) but are "calculated" to influence or retaliate against the government—in different contexts. In *United States v. Doggart*, the sentencing court imposed a Note 4(A) upward departure where the defendant was convicted of soliciting the destruction of religious property in connection with his plan to burn down buildings in a Muslim community, seeking to "set[] in motion an armed insurrection against the government of the United States that would force the government of the United States either to respond to" the defendant's planned attacks, "or to give in and capitulate." No. 15-cr-39-CLC-SKL (E.D. Tenn. Sep. 16, 2020), ECF 343 at 6. The Sixth Circuit affirmed, agreeing that the defendant's offense was "calculated to influence or affect government conduct by intimidation or coercion." *United States v. Doggart*, No. 20-6128, 2021 WL 5111912, at *2-4 (6th Cir. Nov. 3, 2021). There, the sentencing court upwardly departed from an otherwise applicable guidelines range that called for 51 to 63 months of imprisonment (equivalent to offense level 24 at Criminal History Category I) to a range of 324 to 405 months of imprisonment (equivalent to offense level 41 at Criminal History Category I).28 *Id*. After departing upward, the court sentenced the defendant to the statutory maximum for his sole offense of conviction, ten years of imprisonment. *Id.* at *1.

In a separate case in the District of Oregon, the sentencing court applied Note 4 when sentencing multiple co-conspirators convicted of violations under 18 U.S.C. § 372 and related offenses for their roles as part of Ammon Bundy's 2016-armed occupation of the Malheur National Wildlife Refuge, based on their disagreement with federal land management policies. These

coconspirators, some of whom were armed, formed a convoy, entered the Malheur refuge, and then set up a perimeter blocking the entrance of personnel from the Fish and Wildlife Service and other federal agencies. As they indicated in public statements, the occupiers aimed to "adversely possess" the federal land at the Malheur refuge and to compel the release of two other ranchers who had been convicted of arson on federal land. Although some defendants involved in the occupation claimed their actions were peaceful, certain defendants carried firearms as they patrolled the refuge, including in a fire watchtower where they stood guard, and one of the defendants was a member of the "Washington III%" militia. The court applied a Note 4 upward departure to eleven of the thirteen defendants who had pled guilty (some of whom had agreed to the application of the departure in their plea agreements), departing upward two offense levels (one defendant), three offense levels (four defendants), five offense levels (three defendants), and ten offense levels (one defendant). *See United States v. Patrick*, No. 16-cr-51-BR-9 (D. Or. Feb.18, 2018), Sent. Tr. at 43-45. The court then applied four- and two-level departures to two defendants convicted at trial. *Id.* at 46; *United States v. Thorn*, No. 16-cr-51-BR (D. Or. Nov. 21, 2017), Sent. Tr. at 12.

**Resulting Offense Level**

Given Alam's egregious conduct on that day, thoroughly detailed through the evidence presented at trial and reflected in the jury's verdict as to each count, the government asserts that a 4-level upward departure under § 5K2.7 and and a 2-level upward departure under § 3A1.4 cmt. n.4(A) is warranted. After application of the upward departures, the total offense level would be 30.

**Criminal History Category and Resulting Guideline Range**

The U.S. Probation Office calculated the defendant's criminal history as category III, which is not disputed. PSR ¶ 78. Accordingly, based on the government's calculation of the defendant's total adjusted offense level of 30 (reflecting a six-level upward departure), Alam's Guidelines imprisonment range is 121 to 151 months' imprisonment. The government's recommendation of 136 months' incarceration falls in the middle of that range.

As discussed below, even if the Court disagrees with the application of these specific departures, the government nevertheless believes a 136-month sentence is necessary and just under §3553(a). Thus, whether characterized internally as a departure or externally as a variance, the government's recommendation is fair, accounts for egregious conduct, poor history, and characteristics, and showcases the need for deterrence.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Alam's criminal conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. And Alam's role in fueling the violence and chaos that day is significant. Alam's actions that day directly and substantially created a situation where officers were compelled to engage in lethal force, <u>for the first and only time that day,</u> to protect the lives

of their protecteees.

Alam entered the Capitol building through a broken window at the Senate Wing Doors just five minutes after they were initially breached and roamed throughout four floors of the Capitol building, entering offices, kicking at a door, and ultimately ending up at the House Main Doors where he was at the front of a mob of rioters breaking through a police line. He then went to the Speaker's Lobby Doors, where he moved to the front of that mob, assaulted officers guarding the doors by throwing himself against the officers while punching and shattering the glass door panels near their heads, all while Congressional members and staffers on the other side of the doors were visibly attempting to flee from the House floor. He then kicked the doors and smashed the panels out with a helmet, after which another rioter attempted to climb through one and was shot and mortally wounded. The nature and circumstances of Alam's offenses were of the utmost seriousness, and fully support the government's recommended sentence.

### B. The History and Characteristics of the Defendant

Alam completed his undergraduate education at the University of Virginia and one and a half semesters of graduate schooling at Alabama College of Osteopathic Medicine. PSR ¶ 112. Over the past decade, he has had an inconsistent work history. PSR ¶ 115-119. During that same time, he has accumulated a significant history of arrest and conviction:

- In May of 2014, Alam was charged with Driving While Intoxicated (DWI) and later sentenced to a 30-day suspended sentence. PSR ¶ 70.

- In May of 2015, Alam was charged with Drunk in Public and later paid a $75 fine and $92 in costs. PSR ¶ 71.

- In July of 2015, Alam was charged with Possession of Marijuana and later was convicted under a deferred finding of guilt. He violated his probation and in

March of 2018 the deferred finding was revoked, and he was sentenced to pay a $200 fine. PSR ¶ 72

- In January of 2017, Alam was charged with Unauthorized Use of a Vehicle and later was sentenced to 5 months imprisonment, with the execution of sentence suspended as to all but 18 days. PSR¶ 73.

- In January of 2017, Alam was charged with and later convicted of Leaving After Colliding Property Damage/Injury to Animal and Driving Under the Influence of Alcohol or a Drugs. He was sentenced to 90 days imprisonment with the execution of sentence suspended, and one-year supervised probation. PSR ¶ 74.

- In February of 2017, Alam was charged with Petite Larceny and was later convicted. He was sentenced to one year imprisonment. PSR ¶ 75.

- In November of 2018, Alam was charged and later convicted of Possession of an Open Container of Alcohol. He was sentenced to credit for time served. PSR ¶ 76.

- In March of 2019, Alam was charged and later convicted, in absentia, of Fare Evasion. He was sentenced to a $50 fine and $126 in costs. PSR ¶ 77. [8]

Alam's crimes on January 6 were not an isolated event in an otherwise law-abiding life. The defendant's criminal history paints the picture of an individual willing to engage in routine theft and property destruction as a means to fuel his penchant for clubs, designer clothes, vehicles, and marijuana and alcohol. His criminal history demonstrates a significant lack of accountability for his actions or respect for the law. Moreover, despite numerous arrests, convictions, and court-ordered treatment for alcohol-fueled conduct, Alam continues to deny "using either [alcohol or marijuana] excessively." PSR ¶ 109. His current case demonstrates a concerning escalation in

[8] The defendant was ultimately not charged following three separate arrests involving bicycle theft. On one occasion, he was apprehended in the apparent act of attempting to steal a Metro Transit bicycle while he had an outstanding warrant. The warrant was executed and the defendant was not charged with the offense that led to his arrest. On two other occasions, bike theft victims found the defendant attempting to sell their stolen bikes. Both times, the defendant claimed to have innocently received the bicycles without knowing they were stolen and was not charged.

41

criminality, both in the actions themselves and his subsequent attempts to evade arrest. Moreover, Alam is smart, well-educated, has no mental health concerns, was raised by a stable family, and was nearly thirty at the time of his crimes. Despite these advantages, Alam chose to break into the United States Capitol Building, assault officers, destroy barricades, and add fuel to the fire raging around him. This was the culmination of a nearly a decade of using crime to fulfill his desires. Alam's history and characteristics, including his history of arrest and conviction therefore weigh heavily in favor of a lengthy term of incarceration.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Alam's criminal conduct on January 6 was the epitome of disrespect for the law. Footage of Alam exhorting the mob to attack members of Congress before they escaped and then punching out the windows of the barricade protecting them was streamed to viewers around the world and made him immediately infamous. Just as with Dominic Pezzola,[9] who smashed the window Alam jumped through when he entered the building, the public will appropriately note the sentence Alam receives for his notorious crime and appreciate the need for such conviction.

---

[9] "You really were, in a some ways, the tip of the spear that allowed people to end up getting into the Capitol." *United States v. Dominic Pezzola*, No. 1:21-cr-175-TJK-6 (Transcript of September 1, 2023 Sentencing at 88).

**D.      The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. First, as discussed above, the defendant's significant criminal history shows a clear pattern over a period of years of disrespect of the law. Second, the defendant has never expressed any remorse and contrition of his acts on January 6, and in fact was making plans to publicize those acts while he was fleeing from justice in January of 2021. He wrote of his actions as "patriotic" and alluded to plans to make a video in which he would "certify [his] American-ness," explain "why I did what I did[.]"

Notably, although the government did not seek imposition of §3C1.1 for obstructing justice when he evaded law enforcement and prepared to disappear, the Court can and should account for his flight and intended destruction of evidence in accounting for a just sentence.

---

[10] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

Here, the guidelines are instructive, to a point. As discussed above, the guidelines as they currently stand do not sufficiently capture the substantial disruption of government, the violence and intimidation used against the U.S. government and its protecters, or the fact that – but for a single witness-scheduling issue – the government was prepared to prove beyond a reasonable doubt, let alone by preponderance of the evidence, that the defendant destroyed property over $1,000. That latter fact would have greatly enhanced the defendant's exposure under the guidelines – a windfall he does not deserve. Even if the Court were to downward vary or depart had it applied §3A1.4, the defendant's unique and violent actions merit a significant punishment.

44

F.      **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[11]

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Thomas Webster,* 21-cr-208 (APM), Webster played a violent role in the attack on the Capitol. Unlike Alam, Webster was a former Marine and retired New York Police Department officer. Gov. Sent. Mem., Webster, 21-cr-208 (APM), ECF No. 104, at 15 (D.D.C. filed Aug. 12, 2022). Like Alam, Webster riled up the mob with his behavior and taunted and assaulted officers. *Id*. at 16-25. Webster did so on the Lower West Terrace outside of the Capitol, which resulted in opening a breach in the police line and allowing a flood of rioters to stream towards the Capitol building. *Id.* at 21. Webster was convicted of all charges following a jury trial, including a violation of 18 U.S.C. § 111(a) and (b). Webster was sentenced to 120 months, having received a 2-level enhancement for obstruction of justice and enhancements for wearing body armor and applying restraint to a victim.

---

[11] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

There are a number of similarities between Webster and Alam. They both taunted and assaulted officers. They both also incited other rioter and were convicted of civil disorder. But Webster was not convicted of 18 U.S.C. § 1512(c)(2).

Another significant distinction between the two cases is that Webster was in Criminal History Category I, had previously served in the Marine Corps, and was a retired police officer. Unlike Webster, Alam has not lived a law-abiding life. He has not served either his country or his community. In contrast to Webster, Alam has racked up more than twenty criminal arrests and numerous convictions during his much shorter adult life, leaving him with six criminal history points and at the top of Criminal History Category III. In comparing Webster and Alam, the Court must appropriately account for their different criminal histories, and indeed, a criminal history that appears to exceed its computation. Alam is simply in a different criminal class.

Another significant distinction between Webster and Alam is that while Webster's violent conduct was also very significant, it occurred outside the Capitol building and well away from the targets of the mob's rage. In contrast Alam's acts occurred throughout the building and culminated at a final set of wooden doors protecting panicked lawmakers only feet away. After accessing four separate floors of the Capitol in his effort to stop the certification Alam arrived at the entrance to the Speaker's Lobby. There he repeatedly attempted to smash down the doors in front of an angry mob which he himself had incited. Smashing down those doors would give the mob direct access to members of Congress who could be seen by Alam and the others fleeing on the other side of the doors. Alam's actions at the Speaker's Lobby were uniquely dangerous as they caused a direct and immediate danger for officers, Congressional members and staff, and fellow rioters. And that

threat was so acute at that moment that officers were compelled to engage in lethal force to protect the lives of the members.

In *United States v. Rodriguez*, 21-cr-246 (ABJ), Rodriguez battled with officers in the "tunnel" constructed for the Inaugural Stage on the Lower West Terrace. Gov. Sent. Mem., Rodriguez, 21-cr-246 (ABJ), ECF No. 189, at 12-16 (D.D.C. filed June 9, 2023). During this battle, Rodriguez tased an officer in the neck. *Id.* at 21-24. Then, when Rodriguez's attempt to access the building via the "tunnel" failed, he broke into an office adjacent to the "tunnel." *Id.* at 27-30. Rodriguez, with a Criminal History Category I, pleaded guilty was sentenced to 150 months for his actions including the assault.

Though the case above dealt with an extremely aggravated assault on a vulnerable law enforcement officer and should be considered by this Court, the procedural posture of that case at sentencing is important to consider as well when considering it in relation to the present case. Rodriguez pled guilty to his crimes and was appropriately given credit for acceptance of responsibility. Alam chose his right to go to trial and is not entitled to any such consideration as Rodriguez was given. Another important distinction is that Rodriguez was in Criminal History Category I like Webster. As previously noted, Alam is in Category III. Finally, as with Webster, Rodriguez's actions occurred outside and at the entry to the Capitol building, Alam's most significant, violent acts occurred just outside of the Chamber to the House of Representatives with members present and visible.

Another sentenced defendant who covered a similar path through the Capitol as Alam and was in the mob with him in the Statuary Hall connector to the House Main Door was Christopher Grider. He was sentenced to 87 months' imprisonment after being convicted in a (non-stipulated) bench trial. *United States v. Grider*, 21-cr-022 (CKK). Grider marched to the Capitol after former

President Trump's speech. Gov. Sent. Mem., Grider, 21-cr-022 (CKK), ECF No. 170, at 4 (D.D.C. filed Apr. 14, 2023). He entered the Capitol through the Senate Wing Door soon after the initial breach, saw an exposed circuit-breaker box and tried unsuccessfully to turn off the power, saw other rioters scuffle with officers in the Crypt, and, once he joint the mob near the House Main Door, motioned for rioters to join the push against officers and yelled out "stop the steal!". *Id.* at 8-13. He was not at the front of the group at the House Main Doors but was seen holding up a helmet in his hand. *Id.* at 12-13.

After the mob breached the police line Grider then went, like Alam, to the Speaker's Lobby, where he joined rioters and eventually handed his helmet to Alam; Grider also tried to open the door in the area. *Id.* at 16-18. He pled guilty to two misdemeanor charges before trial and was convicted at trial of one felony count each of 18 U.S.C. §§ 231(a)(3), 1361, and 1512(c)(2), as well as four additional misdemeanors. *Id.* at 18-19.

There are a number of similarities between Grider and Alam. They both entered through the Senate Wing Doors, they both were in the mob which overran officers at the House Main Doors, and they both were at the Speaker's Lobby Doors attempting to breach the police line. But Alam was convicted of assaulting police, whereas Grider was not.

From a procedural and Sentencing Guidelines perspective, one aggravating factor in Grider's case was that he took the stand in his own defense and testified falsely regarding his mental state. *Id.* at 20. As was his right, Alam did not testify. However, Grider had zero criminal istory points and like the other defendants whose cases were cited above, was in Criminal History Category I. Alam has six criminal history points and is in Criminal History Categ]ory III.

The most significant distinction between Grider and Alam, however, is in the nature of their conduct. While Grider's most significant conduct that day in handing that helmet to Alam was unquestionably serious, he merely facilitated what Alam then did. As the government stated in its Sentencing Memorandum in the Grider case, "[Grider] chose to join the siege of the House Chamber at the House Main Door. And, most tragically, he chose to help Alam break down the Speaker's Lobby's glass doors, setting in motion the chain of events that led to the death of another rioter." *Id.* at 28.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence,"

§ 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Alam was convicted of a violation of an offense under Title 18, so the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[12]

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

Alam should be required to pay a total of $4,484 in restitution for the following reasons. First, the Court should require Alam to pay $2,000 in restitution as this amount fairly reflects Alam's general involvement in the riot and the damages resulting from that conduct. In cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this

Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity. Further, at least one of the offenses of which Alam was found guilty, 18 U.S.C. § 1361, triggers mandatory restitution under the Mandatory Victims Restitution Act ("MVRA") as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). In this case there is an exact calculation of the damage directly caused by this defendant's individual criminal acts at the Speaker's Lobby, and additional restitution in that amount should be ordered. The Architect of the Capitol provided a detailed cost breakdown for repairs to the Speaker's Lobby Doors where Alam punched, kicked, and otherwise damaged the doors and windows. Attachment A. These repairs totaled $2,484, and a detailed cost breakdown was provided to Alam in discovery. This includes the cost in parts and labor to replace the windowpanes broken by Alam, and to re-paint and repair the doors themselves. For these reasons Alam should be required to pay total restitution in the amount of $4,484.

## VIII.        CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 136 months' incarceration, three years of supervised release, $4,484 in restitution, and a mandatory assessment of $655.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:        /s/ Joseph S. Smith, Jr.
JOSEPH S. SMITH. JR.
CA Bar No. 200108
Assistant U.S. Attorney
601 D Street, N.W.
Washington, D.C. 20530
(619) 546-8299
joseph.s.smith@usdoj.gov

/s/ Rebekah Lederer
REBEKAH LEDERER
Pennsylvania Bar No. 320922
Assistant U.S. Attorney
601 D Street. N.W
Washington, DC 20530
(202) 252-7012
rebekah.lederer@usdoj.gov